[No. B125875. Second Dist., Div. Seven. Sept. 22, 1999.]

In re ANDREA R., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Plaintiff and Respondent, v.
DANIEL R. et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part B of the Discussion.

## COUNSEL

Sharon S. Rollo, under appointment by the Court of Appeal, for Defendant and Appellant Daniel R.

Mary Elizabeth Handy, under appointment by the Court of Appeal, for Defendant and Appellant Yolanda R.

Lloyd W. Pellman, County Counsel, and Lois D. Timnick, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

LILLIE, P. J.—Yolanda R. and Daniel R., the mother and father of Andrea R., born September 16, 1990, appeal from a September 15, 1998, order terminating their parental rights (Welf. & Inst. Code, § 366.26)[1] and referring Andrea for adoption, six years after Andrea was removed from parental custody.

Appellants contend (1) after the establishment of a legal guardianship of Andrea, they were entitled to a full evidentiary hearing on the issue of changed circumstances under section 366.3, subdivision (c), prior to the court's holding a new section 366.26 hearing; (2) the trial judge abused her discretion in terminating parental rights because she was new on the case, refused Yolanda R.'s request that Andrea testify, and failed to consider the strong parent/child relationship under section 366.26, subd. (c)(1)(A); and (3) the court abused its discretion in summarily denying a section 388 petition for modification lodged by Yolanda R. on April 29, 1998.

### FACTUAL AND PROCEDURAL BACKGROUND

At the time of Andrea's birth in September 1990, Yolanda R. had quit using heroin and was in a prenatal methadone program; her two older daughters by a different father had been made dependents of the court and the paternal grandmother had been granted guardianship of them in 1986. Yolanda's relationship with Andrea's father began in 1989. After Andrea was born, Yolanda R. began using drugs again. Daniel R., who was a registered drug offender with a criminal history, apparently did not live with Yolanda R. When Andrea was about a year old, Yolanda's brother took over her primary care; in July 1992, Yolanda's brother died suddenly and

---

[1]Unless otherwise specified, all statutory references are to the Welfare and Institutions Code.

Yolanda again took custody of Andrea. In September 1992, Yolanda was evicted from her apartment; she was with Andrea in the welfare office applying for homeless assistance when she appeared intoxicated and unconcerned about supervising her toddler; Yolanda told the social worker that she was on methadone. .

On September 24, 1992, the Los Angeles County Department of Children and Family Services (DCFS) filed a petition on behalf of Andrea, which alleged, as later sustained under section 300, subdivision (b), that Yolanda had a history of heroin use which limited her ability to care for her child. Andrea was placed in the home of her maternal cousin, Eleanor Z., known to Andrea as Aunt Eleanor. In January 1993, Yolanda was arrested for being under the influence of a controlled substance and the petition was amended to include allegations that Yolanda's heroin use made her unable to safely care for Andrea. Neither Yolanda nor Daniel R. appeared for a disposition hearing on March 30, 1993, when the court ordered Andrea removed from her parents' custody and ordered family reunification services; Yolanda was to participate in drug counseling and testing; father was to participate in counseling as directed by the parole department.

The social worker's report dated September 28, 1993, noted that Yolanda had been incarcerated for most of the last six months and had one monitored visit since her release from jail; she appeared to be transient and had not enrolled in a drug program; Daniel R. had not sought visitation nor contacted DCFS. Andrea was happy living with her Aunt Eleanor, who had expressed an interest in guardianship or adoption of Andrea if reunification failed. An adoption assessment completed in December 1993 stated that Andrea was appropriate for adoption and that her aunt wished to adopt her.

In early 1994, Daniel R. began regular visits with Andrea and expressed a desire to be involved with her; Yolanda's whereabouts were unknown. In March 1994, the social worker recommended guardianship for Andrea with her aunt. In the spring of 1994, Daniel R. was permitted to take Andrea to visit Yolanda for four hours on the weekends; in June 1994, the parents had a verbal argument and Daniel left Andrea with Yolanda at her residence, the Sober Living Home; the social worker recommended that parent/child visits be monitored by a DCFS social worker. In August 1994, Yolanda started a drug rehabilitation program but was discharged several weeks later because she had a positive test for heroin and had a negative impact on other clients at the program; Yolanda admitted that she was colluding with others to obtain another person's urine for her drug testing and to deceive the court. The social worker's report for August 1994 noted that although Daniel R. had services offered to him for about 21 months, he still had no stable

residence and appropriate daycare arrangements for Andrea while he worked on his construction job; he previously resided in his mother's home or slept in his truck on a construction job site. The report also stated that the parents had an "entangled" relationship and frequently engaged in open battle with verbal obscenities in front of the child, who was even caught in a physical tug-of-war between her parents; Andrea had cried and was visibly shaken. The social worker also recommended adoption planning.

The social worker's September 1994 report noted that Andrea was coming home from visits with her father in an unmanageable condition, aggressive, haughty, and having tantrums; Andrea said that her father would secretly take her to see her mother, and her parents told her to keep it a secret; the court had apparently ordered that a social worker, and not the father, was to monitor the mother's visits. Aunt Eleanor told DCFS that she could not bear up under the pressure from the parents, who told Andrea that she did not have to obey her caretakers because they were not her parents; the social worker found it clear that Andrea was being coached to lie or be dishonest with the social worker and that Andrea was being told not to trust the social worker or the court with her safety. Because the aunt was requesting that Andrea be placed elsewhere, the social worker recommended adoption for Andrea, as it afforded Andrea more stability and was in her best interest. A subsequent report stated that Andrea had symptoms of emotional distress, was confused and concerned about who loved her and what would happen to her in the future.

On January 23, 1995, when Andrea was four years old and had lived with her aunt for about two and one-half years, Eleanor Z. contacted DCFS and requested that Andrea be removed due to marital and financial problems. Andrea was thereafter placed in the foster home of Don and Carolyn H., where she lived for about another two and a half years. Although Don and Carolyn H. provided a good home for Andrea and she was happy there, they did not want to adopt her. Pursuant to a mediated agreement approved by the court on March 28, 1995, Andrea was to be released to Daniel R. once he secured adequate housing and an approved child care plan, but he was not to monitor visits with Yolanda R. The matter was continued for two months, however Daniel R. did not appear at the May 1995 hearing and did not visit Andrea from May 1995 to November 1996; Daniel R. claimed that he only failed to visit Andrea for a nine-month period, and that he was working in Las Vegas at the time. Yolanda, who in May 1995 was pregnant by a man other than Daniel R., visited with Andrea only sporadically during this time; the social worker's September 1995 report stated that Yolanda had only had two visits with Andrea in the last nine months.

At a section 366.26 hearing on September 27, 1995, the court terminated family reunification services and found that Andrea was adoptable and that

adoption was the permanent plan, stating that "the court is very close to severing parental rights, and my only reason for not doing it is because we don't want to create a legal orphan, as the Department has not identified a home. At this point, I think efforts should be made to identify a home."

In October 1995, Yolanda gave birth to twins, who tested positive for drugs at birth; the twins were made dependents of the court.[2] In May 1996, Yolanda entered a six-month residential drug facility and resumed visits with Andrea in July 1996. Also in July 1996, Andrea began visiting two to three times per week with Bruce and Penny B. (the B.'s), and their 11-year-old daughter and 12-year-old son, a family who attended the same church as Andrea's foster family and who had known Andrea for over a year; the B.'s were interested in adopting Andrea.

The sporadic nature of her parents' visits left Andrea confused and anxious, and by late 1996, she was reacting to contact with her parents by urinating and defecating in her underwear; Andrea expressed fears that she would be asked at court where she wanted to live and she did not want to have to choose or hurt anyone; she began using her then foster family's last name, even though they did not want to pursue adoption. In February 1997, the social worker reported to the court that a prospective adoptive family had been found, the B.'s, and a home study was being conducted. In the meantime, Yolanda was making excellent progress in her rehabilitation program and had been clean and sober since May 1996. In March 1997, Yolanda graduated from a 10-month residential drug rehabilitation program and moved into her own apartment; she continued to participate in a drug and alcohol program and had the twins with her on a 60-day visit. Both parents opposed adoption of Andrea; Daniel R., who in late 1996 had resumed visits with Andrea, wanted her returned to his custody.

An April 1997 psychological evaluation by Dr. Michael Ward stated that during the three and one-half years that Andrea had been in placement, the parents' visits had been extremely sporadic, and their efforts at visitation were extremely short in duration compared to their long periods of absence; while Andrea enjoyed the visits and appeared to have an affectionate bond with them, she could not rely on them to be there for her at any given time; moreover, he had concerns about Yolanda's possibility of relapse in that she had been out of the residential treatment program for only one month; in his opinion, the parents needed more time to stabilize their individual and collective lives. However, because Andrea had a good relationship with both her parents, she would be "quite upset" should she lose contact with them; Dr. Ward recommended legal guardianship.

---

[2]After a 60-day visit, the twins were placed with Yolanda R. in April 1997; dependency jurisdiction as to them was terminated in April 1998.

In April 1997, Yolanda R. filed a section 388 petition seeking the return of Andrea to her custody; the petition was denied after a hearing on May 21, 1997, where the evidence on the section 388 petition was also considered to apply to a section 366.26 hearing. At the May 1997 hearing, at the urging of counsel for Andrea, the court ordered guardianship as the appropriate plan; after hearing on September 11, 1997, the court appointed the B.'s as Andrea's guardians, although the court stated then that it was beginning to question the guardianship decision, rather than adoption as a permanent plan "because it seems to me that we are putting the minor in a very difficult position, and that it's likely that her problems will continue or become even graver than they are." The DCFS report for September 11, 1997, stated that the parenting skills of the parents were limited at best; Yolanda was making promises to Andrea that she would be home with her by her seventh birthday on September 16, 1997, and she would not have to live with the B.'s for the rest of her life; Yolanda asked Andrea to decide who should be her daddy, Daniel R. or Sonny, her current boyfriend; Andrea was bewildered and resumed her behavior of soiling her underwear around the time of contact with her parents; she was confused and experienced divided loyalties between the B.'s and her mother; as the date of her birthday approached, Andrea became more defiant and oppositional. The B.'s contacted Andrea's former therapist and Andrea resumed treatment on September 9, 1997. DCFS recommended adoption as the permanent plan for Andrea, even though on May 21, 1997, the court had ordered DCFS to prepare a report for the September 11, 1997, hearing regarding legal guardianship.

A social worker's report prepared for a March 1998 hearing stated that the B.'s previously, and still, expressed a desire to adopt Andrea; they felt they were pressured into previously accepting guardianship, rather than adoption, out of fear that they would lose custody of Andrea. Around Christmas 1997, the B.'s invited Yolanda and the twins to a church program in which Andrea was participating; Yolanda and her boyfriend Sonny attended the program reeking of alcohol, with the odor noticeable by others in the audience. Daniel R. told Andrea that Sonny used drugs, and Andrea had a crying spell for which Mrs. B. had to calm her down; Andrea told Mrs. B. that her father was not telling the truth because Yolanda R. had told her that Sonny did not use drugs. Andrea began the 1997 school year with severe acting-out behaviors, urinating and defecating in her pants three or four times daily, the incidents had almost ceased by March 1998; Andrea had made continual and dramatic progress since September 1997, and had formed strong attachments with the B.'s; she was experiencing success both academically and behaviorally; the social worker stated that the B.'s home was "child focused, emotionally nurturing, and intellectually stimulating," and due to positive parenting skills and the expression of genuine love and affection, Andrea was more relaxed

and well adjusted. The report also noted that Yolanda's boyfriend Sonny passed away unexpectedly in February 1998 and Yolanda had not telephoned Andrea since that time; Andrea was receiving counseling for emotional problems and was making continual progress; the counselor attributed her progress to the nurturing, consistency and stability provided by the B.'s and suggested that adoption was in Andrea's best interest. According to the social worker, the counselor said that Andrea's parents "are not helping her resolve any issues that she is struggling with, but instead keep her in a state of confusion and turmoil . . . . She's forced to play a role that forfeits her childhood."

DCFS noticed a hearing for April 29, 1998, for review of the permanent plan pursuant to section 366.3 The social worker's report for the hearing stated that in April, Yolanda R. had telephoned Andrea and told her that she was going to court to get back the twins and she might be able to get Andrea to come live with her too; Yolanda R. told Andrea that if she lived with her, she would be able to choose her own bedtime. The B.'s felt Andrea's conversations with her mother were inappropriate and undermined their influence and authority; Andrea's teacher reported that Andrea was becoming more argumentative.

Shortly before April 29, 1998, Yolanda R. lodged a motion to terminate guardianship pursuant to section 388, and to return Andrea to her custody; the caption indicated a hearing date of April 29, 1998. The motion was supported by Yolanda's declaration; she declared that she had been completely free of any illegal substances for over two years, and had completed all court-ordered case plans; she believed her recovery was permanent; two weeks earlier, jurisdiction had been terminated over her two-year-old twins; she had a full-time job and was also serving as an assistant manager of the apartment building where she and the twins lived; she visited Andrea for two to four hours every week and occasionally every other week; Andrea is happy to see her and constantly asked when can she come home to her; she avoids the subject because she did not wish to create any false expectations; Andrea has told her that if she comes home to her, she would still want to go back and visit with the B.'s. Yolanda also asserted that the B.'s have not dealt fairly with her, and their reports to the social worker that she was inebriated at Andrea's Christmas pageant, visited only infrequently, and that Andrea makes negative comments about her home were "maliciously false."

On April 29, the court continued the hearing on the permanent plan to July 7, 1998. The social worker's report for the July 7, 1998, hearing stated that Andrea said that she would like to live with Yolanda; her second choice was with Mrs. B. The social worker also reported that Andrea was doing well in

the home of her guardians, who were committed to adopting her; the guardians believed that it was important to terminate parental rights so Andrea could experience permanency; in their opinion, visitation with mother and phone calls with the father had been inappropriate and counter-productive to Andrea's emotional well-being, leaving her confused; although visits with her father were appropriate, Andrea seemed to withdraw after visits with her parents.

On July 7, the court continued the hearing again as the parents had not been given 45 days' notice of the DCFS recommendation of termination of parental rights and implementation of a plan of adoption; the parents, who were present in court on July 7, 1998, were then personally served with notice of hearing set for September 15, 1998. Andrea also appeared at the July 7 hearing; her attorney requested the court to waive Andrea's appearance for the September 15 hearing, as she would be in school and "I don't know that there's anything she can add to the proceedings," as her comments were reported in the social worker's report. Father's counsel objected, stating that it was important for the court to be able to have testimony from Andrea and to assess her demeanor. The court responded, " I think I have to order her back if they want to cross-examine her and we are setting it for contest. . . . [¶] I don't want to hear testimony. They have the right to offer it to me. If they do, I can assure you, I will consider it and weigh it in the mix. So the [B.'s] are to bring Andrea back on September 15."

The social worker's report for the September 15, 1998, hearing contained a brief legal history of the matter and then noted that although Yolanda R. had not made a statement for the report, Daniel R. had contacted the social worker and expressed his concerns about the adoption plan; he also requested a visit with Andrea and was told the visit would have to be coordinated with the social worker and the legal guardians.

All parties, including Andrea, were present in court for hearing on September 15, 1998; Yolanda R.'s counsel inquired about the status of Yolanda's motion to set aside the guardianship lodged with the clerk on April 29; according to counsel, the court commented on April 29 that it would like time to decide whether to set it for a hearing. The court responded that it did not have the legal file, but only the "dummy file," but the court believed the motion was in the file. The court asked if counsel had previously raised the issue of setting the motion for hearing, and counsel stated that she had. The court then stated "And I thought that if parents' rights are terminated and Andrea is adopted, then, at that point the legal guardianship would terminate." Yolanda's counsel then argued that the procedures pursuant to section 366.3, subdivision (c), had not been followed, in that DCFS had not shown

changed circumstances and a new adoption assessment had not been prepared.[3] The court responded that the parents had known since April 1998 "that there would be a hearing pursuant to 366.26 to consider a plan of adoption by these folks who are Andrea's guardians. You are saying they were not noticed, and I think you are saying that I have to find changed circumstances. I don't think I have to find changed circumstances, but the fact there are changes in circumstances, they [the B.'s] want to adopt now."

In response to Andrea's counsel's comments on earlier orders of the court rejecting adoption in favor of guardianship, the court stated that "I don't have either the reports from that time period or the evidence from that time period. All I have right now is the report dated September 10, 1998, and somebody else's report dated July 7, 1998, and a report that reflects the same date. That's the only evidence I have." The court then noted that the evidence in the recent social worker reports "is that Andrea is doing exceptionally well in the home of the people who want to adopt her and they are developing a strong relationship," and that Andrea truly loved her guardians. The court stated that "I have nothing but the argument of counsel on which to rest a finding that at some point in May of 1997, the case would have come within the exception of section 366.26(c)(1)(A)."

Yolanda R.'s counsel again reiterated that there must be a change of circumstances for the court to modify the permanent plan from guardianship to adoption, and that "the report stated by the department does not show any changed circumstances," and that the court cannot change the plan without taking testimony and receiving evidence of changed circumstances "and whether [adoption] would be what would serve the minor's best interest based on the testimony." The court responded, "I understand your argument. I already rejected it. Do you have anything else?" Counsel for Daniel R. then reiterated that section 366.3, subdivision (c) "requires a hearing pursuant to an order to show cause as to changed circumstances." The court stated that "these arguments should have been raised a long time ago. Specifically before the time the .26 was set on calendar, and it's a waste of argument today. [¶] The court can receive reports into evidence today concerning

---

[3]Section 366.3, subdivision (c) provides: "If, following the establishment of a legal guardianship, the county welfare department becomes aware of changed circumstances that indicate adoption may be an appropriate plan for the child, the department shall so notify the court. The court may vacate its previous order dismissing dependency jurisdiction over the child and order that a hearing be held pursuant to Section 366.26 to determine whether adoption or continued guardianship is the most appropriate plan for the child. The hearing shall be held no later than 120 days from the date of the order. Whenever the court orders that a hearing shall be held pursuant to Section 366.26, the court shall direct the agency supervising the child and the licensed county adoption agency . . . to prepare an assessment under subdivision (b) of Section 366.22."

changed circumstances and the court can consider changed circumstances, the changed circumstances and the merits of the reports, and whether there's a change. The court can receive that information into evidence . . . . Does anyone have anything else to offer before the court makes its ruling on the .26?"

Yolanda R.'s counsel then asked the court to make a ruling not to terminate parental rights and to return Andrea to her mother's custody. Daniel R.'s counsel then asked the court to return Andrea to her father's custody, remarking that Andrea would turn eight years old the next day and counsel did not know if her testimony about where she wants to live would be relevant. Yolanda's counsel then asked that Andrea be allowed to testify. The court responded, "I'm not going to call Andrea to the stand. For her to testify about her relationship with her siblings is not sufficient reason for her to testify. Anything further . . . ?" Yolanda's counsel replied, "No, your Honor, but before the court makes its ruling, I would ask what the court's ruling would be on the mother's 388." The court stated that "I'm ruling on the .26 and there's nothing before me on the 388. Okay. The court finds reunification services will be terminated, and the court finds by clear and convincing evidence that Andrea is adoptable and will be adopted. Parental rights are terminated pursuant to Welfare and Institutions Code section 366.26, and the case will be referred to the Children's Alliance for the adoption process."

The minute order for September 15, 1998, stated that "Mother's motion to terminate the guardianship is denied."[4] The minute order also stated "The court finds that it will be detrimental to the minor to be returned to [Yolanda R. and Daniel R.] and the parents' rights are terminated."

Both Yolanda R. and Daniel R. filed notices of appeal from the September 15, 1998, order. Daniel R. has joined in the opening and reply briefs of Yolanda R.

## DISCUSSION

### A. *Order Terminating Parental Rights.*

■ Appellants contend that the order terminating their parental rights is void pursuant to section 366.3 because the court lacked jurisdiction to hold

---

[4]Contrary to the exchange between the court and counsel at the September 15, 1998, hearing, which appears to indicate that the trial court did not address the merits of the section 388 motion, the minute order states that the motion was denied, suggesting that the court considered the merits of the motion.

a section 366.26 hearing without first determining, upon a full evidentiary hearing, whether the circumstances supported a change in Andrea's permanent plan of legal guardianship. Appellants argue that before the court can set a new section 366.26 hearing under section 366.3, subdivision (c), the court, and not DCFS, must make a determination on the merits of the assertion by DCFS of changed circumstances, and that such a determination must be made after an evidentiary hearing pursuant to the procedures set out in section 388 and California Rules of Court rules 1432 and 1466.[5]

To the extent that appellants contend that there was no full evidentiary hearing on the issue of whether the permanent plan for Andrea should be adoption or guardianship, such contention is without merit, as the court held such a hearing on September 15, 1998; appellants received proper notice of the hearing, and had an opportunity to present testimony and evidence at that time.

To the extent that appellants contend that the proceedings pursuant to section 366.3, subdivision (c), require that there be a judicial finding of changed circumstances, we note that the trial court questioned the guardianship plan as early as September 1997 and acknowledged at that time that circumstances had changed since the time of the last hearing; moreover, the court did make comments on September 15, 1998, indicating that the social workers' reports then before it contained evidence of changed circumstances. Thus, assuming without deciding that the trial court was required to make a finding of changed circumstances, the trial court did so in this instance. The reports from September 1997 to September 1998 support a finding of changed circumstances in the following respects: after selecting the plan of guardianship in May 1997, Yolanda R. began making promises to Andrea (such as that she would be home with her by her seventh birthday in September) which caused Andrea much stress, and caused her to become difficult and oppositional with the B.'s and to begin to urinate and defecate in her underwear around the time of parental visits; Andrea started the school year in September 1997 with severe acting-out behaviors at school, although her conduct had improved by the time of the March 1998 report; however, Andrea still became withdrawn after visits or telephone calls with her parents, and the B.'s found contact with the parents to be counterproductive to her emotional well-being. The evidence thus supports the implied finding that appellants were taking advantage of the guardianship plan to make promises to Andrea, which caused Andrea to be confused and traumatized, and that the plan of guardianship was not affording Andrea the stability and security she needed.

---

[5]Rule 1432 deals with petitions for modification under sections 388 and 778; rule 1466 deals with hearings subsequent to a permanent plan; rule 1466(c) deals with hearings on petitions to terminate a guardianship or modify guardianship orders.

To the extent that appellants contend that preliminary to a new section 366.26 hearing under section 366.3, subdivision (c), there must be a separate noticed hearing upon a section 388 petition on the issue of whether there are sufficient changed circumstances to warrant setting the section 366.26 hearing in the first instance, we conclude that no appropriate authority is cited to support such a procedural requirement and the language of section 366.3, subdivision (c), does not on its face require such a judicial finding or separate evidentiary hearing. (See fn. 3, *ante*.)

Appellants also fail to establish that anything in California Rules of Court, rules 1432 and 1466 requires such a separate hearing. In *San Diego County Dept. of Social Services* v. *Superior Court* (1996) 13 Cal.4th 882 [55 Cal.Rptr.2d 396, 919 P.2d 1329], the court interpreted rule 1466(b) of the California Rules of Court, which deals with the juvenile court's selection and implementation of a new permanent plan of adoption or legal guardianship after it had previously ordered a permanent plan of long-term foster care. The rule provides that if circumstances have changed since the permanent plan of long-term foster care was ordered, the court may order a new permanent plan under section 366.26 at any subsequent hearing, or any party may seek a new permanent plan by a petition for modification on grounds including change of circumstances. (*San Diego County Dept. of Social Services* v. *Superior Court, supra*, 13 Cal.4th at p. 887.)

The court in *San Diego County Dept. of Social Services* found that there was nothing in California Rules of Court, rule 1466(b) "barring a party from making a request of the juvenile court for a determination of change of circumstances unless . . . he does so through a petition for modification on that ground." (13 Cal.4th at pp. 888-889.) "A determination by the juvenile court of change of circumstances *made 'sua sponte'* . . . does not threaten 'due process rights' that would otherwise be protected by a party's submission of a petition for modification on that ground. A petition depends on a change of circumstances at the threshold and entails a subsequent noticed hearing on the merits. (§ 388; rule 1432.) A determination is no different in this regard. . . . [¶] Similarly, a determination by the juvenile court of change of circumstances *made at a party's request* . . . does not threaten 'due process rights' that would otherwise be protected by the party's submission of a petition for modification on that ground. Like such a petition, a determination of this sort also depends on a change of circumstances at the threshold and entails a subsequent noticed hearing on the merits. . . . True, a party may choose to make a request instead of submitting a petition in order to avoid a shouldering of the burden inherent therein of pleading and proving a change of circumstances. But he causes no prejudice thereby. If he fails in his request, he must then shoulder the burden. If he succeeds, he need

not. He should not be required to plead and prove change of circumstances after the juvenile court has itself made a determination to that effect. [¶] We acknowledge that, under our reading of rule 1466(b), the juvenile court may be able to order adoption or legal guardianship as the new permanent plan in place of long-term foster care more readily than it could otherwise. That does not disturb. As noted, the juvenile court is subject to a mandatory preference that favors both adoption and legal guardianship over long-term foster care." (*Id.* at pp. 889-890.)

In as much as the juvenile court is subject to the mandatory preference for adoption over legal guardianship (*San Diego County Dept. of Social Services* v. *Superior Court, supra*, 13 Cal.4th at p. 891, fn. 5), this policy is only furthered by the fact that section 366.3, subdivision (c), permits the court to more readily hold a new section 366.26 hearing to determine whether adoption or continued guardianship is the most appropriate plan. In that appellants fail to provide any authority to support their contention that the court lacked jurisdiction to hold the instant section 366.26 hearing, we conclude that their challenge lacks merit.

■ Appellants' second major challenge to the September 15, 1998, order terminating parental rights is that the order constituted an abuse of discretion because the judge was new on the case, had little knowledge of the history of the case, refused Yolanda R.'s request that Andrea testify, and failed to consider the strong parent/child bond. There is nothing in our record to support appellants' assertion that the court had insufficient knowledge of the case. Although our record shows that the judge who presided over the September 15, 1998, hearing first presided over a hearing on the case on April 29, 1998, there is nothing to indicate that she did not review the entire file and history of the case prior to the hearing on September 15, 1998. Further, at the time of the court hearing on September 15, the court stated that it had before it only the most recent portions of the court file, thus indicating that it was aware of the nature of the record. This statement, however, does not establish that the trial court was unaware of the prior proceedings in the case; rather, it establishes that only a portion of the court file was then in the courtroom. The trial court clearly told the parties what documents and evidence were before it; if appellants wished the trial court to consider certain other evidence or records, they could and should have requested that the court do so, or bring the other records to the attention of the trial court. The trial court cannot be faulted for appellants' failure to make a different record on the hearing on September 15, 1998.

With respect to appellants' claim that the court on September 15 errone-ously denied Yolanda R.'s request that Andrea testify, we note that such

request was made only in connection with the section 366.26 hearing; her testimony was not proffered in connection with appellants' arguments concerning the section 388 petition. The primary issue before the court on the new section 366.26 hearing was whether guardianship or adoption was the most appropriate plan (§ 366.3, subd. (c)); because the B.'s were both the legal guardians and the prospective adoptive family, and because Andrea had been happily living with the B.'s for over a year, appellants fail to provide any pertinent authority that the denial of testimony by eight-year-old Andrea on the issue before the court constituted an abuse of discretion. Although appellants contend that the trial court should have ascertained Andrea's feelings about being adopted and "having contact with her parents (and siblings) being cut off forever," there is no evidence in our record to support the claim that upon Andrea's adoption her contacts with her parents and siblings would be "cut off forever." In fact, our record indicates that the B.'s expressed a willingness for continued visits between Andrea and her parents.

■ Appellants' final contention with regard to the order terminating parental rights is that Yolanda R. met her burden to show benefit to Andrea by preserving their parent/child relationship and detriment to sever that relationship under the exception set out in section 366.26, subdivision (c)(1)(A). However, other than argument, no evidence was offered on this point by appellants. Appellants were aware of the recent reports before the trial court, and the recommendations by the social workers contained therein. Aside from testimony from Andrea, which issue we addressed above, appellants requested no other evidence to be considered, and presented no other evidence to the trial court for its consideration on September 15, 1998.

"In order for the court to select and implement adoption as the permanent plan, it must find, by clear and convincing evidence, the minor will likely be adopted if parental rights are terminated. (§ 366.26, subd. (c)(1).) The parent then has the burden to show termination would be detrimental to the minor under one of four specified exceptions. (§ 366.26, subd. (c)(1)(A), (D).) In the absence of evidence termination would be detrimental to the minor under one of these exceptions, the court '*shall* terminate parental rights . . . .' " (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164 [53 Cal.Rptr.2d 93].)

■ However, to establish the exception in section 366.26, subdivision (c)(1)(A), the parents must do more than demonstrate "frequent and loving contact" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418 [35 Cal.Rptr.2d 162]), an emotional bond with the child, or that the parents and child find their visits pleasant. (*In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324 [60 Cal.Rptr.2d 557].) Rather, the parents must show that they occupy "a parental role" in the child's life. (*In re Beatrice M., supra,* 29

Cal.App.4th at p. 1419.) Appellants had to show that their relationships with Andrea "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [32 Cal.Rptr.2d 535].)

 As pointed out by respondent, the instant record supports an implied finding by the trial court that appellants did not establish the exception contemplated by the statute: neither parent had visited Andrea regularly during the past six years of her life, neither had progressed beyond monitored visits, neither played a meaningful and significant parental role, and the most recent visits and telephone calls with appellants had left Andrea confused, upset, and so anxiety-ridden that she lost control of her bodily functions. Appellants fail to establish that the trial court erred or abused its discretion in failing to find applicable the exception to termination of parental rights in section 366.26, subdivision (c)(1)(A).

B. *Denial of April 1998 Section 388 Petition.**

. . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The September 15, 1998, order is affirmed.

Johnson, J., and Woods, J., concurred

Appellants' petition for review by the Supreme Court was denied December 15, 1999.

---

*See footnote, *ante*, page 1093.