Filed 5/17/16  In re A.X. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re A.X. et al., Persons Coming Under the Juvenile Court Law. | H042819 (Santa Cruz County Super. Ct. Nos. DP002872, DP002873, DP002874) |
| SANTA CRUZ COUNTY HUMAN SERVICES DEPARTMENT, Plaintiff and Respondent, v. A.M., Defendant and Appellant. | |

A.M. (mother) appeals from the orders terminating her parental rights to three of her children, A.X. (daughter), H.X. (older son) and L.X. (younger son), under Welfare and Institutions Code section 366.26.[1]

On appeal, mother contends the juvenile court erred in terminating her parental rights because it:  (1) ignored substantial evidence of the beneficial parent-child relationship she shared with her three children; (2) ignored substantial evidence of the beneficial sibling relationship the three children shared with their youngest sibling,

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

O.M.;[2] and (3) improperly relied on the promise of postadoption contact in reaching its decision.

We find no merit to mother's claims and will affirm the orders.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Initial juvenile dependency petitions*

In February 2014, the Santa Cruz County Human Services Department (Department) received a report of possible neglect of older son, who was four years old at the time. His teacher said he "frequently comes to school with a strong unpleasant body odor[,] . . . dirty clothing[, and] on several occasions with a strong urine smell." School staff attempted to clean him with wipes and "found dried feces on his buttocks." His teacher sent multiple notes home to mother advising her of older son's hygiene and odor problems and asking that he be bathed, but there was no improvement. The school nurse called mother, who said she bathed older son daily and sent him to school with clean clothing. The teacher reported that older son's hygiene would get worse and, by the end of the week, he would "smell so badly that his peers do not want to be near him."

After observing older son at school, a social worker made an unannounced visit to his home. The social worker observed "excess pigeon food and pigeon feces on the ground approximately twelve inches long and one inch high"[3] and the front yard was littered with "bikes, pieces of wood, and trash." On the porch was a trash bin "approximately 3/4 full of empty 40 oz [*sic*] beer bottles."

The social worker spoke to mother who said she was bathing older son daily and changing his clothes, though she was currently washing her children's clothes in the sink because of money problems and lack of transportation to a laundromat. The social

---

[2] O.M. was born in March 2015 and was taken into protective custody under section 300, subdivisions (b), (g) and (j). He was subsequently placed in the same foster home as his three half-siblings.

[3] The bird food and droppings were underneath a cage on the porch with two pigeons inside.

worker asked to see the rest of the house because of the conditions already observed. The home had a strong unpleasant odor, which mother said was urine because the children "wet themselves at night." Mother said they were currently sleeping in the living room because the smell in the bedroom was overpowering.

The next day, the social worker went to interview daughter[4] at her school. Daughter's hair was in a ponytail but it was noticeably tangled and appeared to be greasy. She was dressed all in pink, with black tennis shoes that had holes in them and were "muddy and very dirty." Although her clothing appeared to be clean, the social worker noticed a strong odor from daughter. The social worker asked if she had clean clothes and daughter said she did not other than the clothes she was wearing. She said mother had not gone to do laundry but had washed her clothes in the sink.

Two weeks later, after mother tested positive for methamphetamines, amphetamines and marijuana, the social worker made another unannounced visit to the home accompanied by a Watsonville police officer. The police officer assessed that protective custody was not warranted at the time, though the "conditions of the home" made it "borderline."

The Department was concerned about chronic neglect, inadequate care, unsafe living conditions, and a lack of medical and dental care for the three children. Both mother and H.X. (father)[5] had continuing substance abuse issues. On March 13, 2014, the Department filed juvenile dependency petitions on behalf of daughter, older son and younger son (then 20 months old) alleging the children were at substantial risk of harm due to: (1) their home environment; (2) the parents' failure to meet their physical, hygiene and medical needs; (3) the parents' mutual violent conduct; and (4) mother's substance abuse. The petitions alleged daughter was suffering severe emotional abuse due to parents' failure to provide her with adequate physical care and hygiene.

---

[4] Daughter was five years old at the time.

[5] Father is not a party to this appeal.

Finally, the petitions alleged that an older sibling, P.M., was declared a dependent in 2006 due to mother's substance abuse, inadequate care and domestic violence. Mother was provided reunification services but failed to reunify and her parental rights were terminated as to P.M. in December 2007.

At the March 14, 2014 detention hearing, the juvenile court found the Department had made a prima facie showing and ordered the children detained. The juvenile court granted temporary custody of the children to the Department pending disposition or further order of the court.

### B.     June 2014 jurisdiction/disposition hearings

Mother and father submitted to jurisdiction and asked to proceed to a contested hearing on disposition. The juvenile court sustained the petition as amended and set a contested disposition hearing, which took place on June 9, 2014.

Mother failed to appear at the contested disposition hearing, and the juvenile court adopted the Department's recommended findings and orders. The Department was ordered to provide father with reunification services, but mother's reunification services were bypassed under section 361.5, subdivision (b) due to the prior termination of her parental rights for P.M. The juvenile court ordered visitation for both mother and father.

### C.     Six-month review proceedings

In the report prepared by the Department for the six-month review hearing, the social worker noted that older son was diagnosed with Prader-Willi syndrome[6] and is now attending a school that can meet his needs.

Mother had been receiving supervised visits with her children, three times per week. She missed five visits in June 2014. The children were sad when she failed to show up for a scheduled visit and would act out. Since she began monthly visits in July

_____

[6] The Department's report indicated that the symptoms of this syndrome "include poor muscle tone, failure to thrive, lack of eye coordination, learning disabilities, speech problems, weight gain, and sleep disorder."

4

2014, she had consistently called the social worker to schedule her visits and attended every visit from July to October 2014. During her monthly visits, she brought healthy snacks, showed affection toward them and asked about their school and foster home.

At the six-month review hearing in February 2015, the juvenile court found father had not made significant progress with his reunification services, but ordered that he be provided an additional six months of services. Mother was not present at the hearing. The juvenile court ordered continued visitation for both mother and father and set a 12 month review hearing.

### D. Twelve-month review proceedings

The Department's report for the 12 month review hearing recommended terminating reunification services for father and setting a section 366.26 hearing to establish a permanent plan of care for the three children. During this period, mother gave birth to another child, O.M., who had also been taken into protective custody and placed in the same foster home as the three children. Jurisdiction and disposition of O.M.'s petition was pending.

The report noted "[a]ll of the children have developed close relationships with the members of the [foster] household and both appear to be and report that they are very comfortable there. The [foster] family have been paramount to modeling and supporting safe and healthy behaviors and positive relationships for the children. The children express excitement and joy in the presence of both of their parents but exhibit significant anxiety and behavioral issues when parents miss or cancel visits." Mother was consistent in her monthly visitation "despite the challenges of pregnancy, substance abuse, homelessness, and a domestic violence relationship. [*Sic*.]" Since March 2015, she had been living at a residential substance abuse treatment center and said "she has been sober since the time of her admittance."

Following the 12-month review hearing, the juvenile court adopted the Department's recommendations, terminating reunification services for father and setting the matter for a section 366.26 hearing.

*E.     Mother's section 388 petition and contested section 366.26 hearing*

Prior to the contested hearing, the Department prepared a report setting forth its assessment and recommendations for the children's permanent placement. In that report, the Department noted "At this time, the [children] do not have a parent/child relationship with their mother. . . . She has participated in regular, once a month visitation[.] The children enjoy seeing their mother, but looks [*sic*] towards their caretakers to meet their daily and on-going needs. [Mother] does not meet her children's day to day physical needs nor their need for stability, consistency and nurturance." The report stated "[t]he minors' need for emotional stability, security and a sense of belonging that their prospective adoptive family can provide outweighs any possible benefit that a parent/child relationship with [mother] . . . would provide." Consequently, "it would not be detrimental to the minors if the parents' rights are terminated."

The report also assessed the children and concluded they were specifically and generally adoptable. The children had been living with the same foster family since March 2014, and "have made significant changes due to the excellent care they are receiving." The foster parents were willing to adopt all three children and were "committed to . . . providing them with a permanent and stable home." The social worker asked daughter and older son[7] if they would like to live with the foster parents "forever and be adopted by them" and both children said they did.

Before the section 366.26 hearing, mother filed a section 388 petition seeking reunification services with the children, based on her progress in addressing her

---

[7] Younger son was only three years old at the time and the social worker did not believe he was old enough to provide "a clear statement" about his desire to remain with the foster parents, though "[h]e presents as comfortable in [their] care."

substance abuse problem. In her petition, mother alleged reunification services were in the children's best interests because she had demonstrated success in treating her substance abuse problem and the children should be raised by their mother.

In its response to mother's section 388 petition, the Department argued mother had failed to submit sufficient evidence to show she had "gained the skills needed to parent . . . three young children on a daily basis." The children have been awaiting permanency for over 18 months and reopening reunification services would not be in the children's best interests.

At the September 28, 2015 hearing, the juvenile court admitted into evidence the Department's section 366.26 report, the reports prepared by the court appointed special advocates, mother's section 388 petition as well as the Department's response to that petition. The juvenile court also admitted into evidence mother's supervised visitation logs and the social worker's contact service logs.

Mother was the only witness who testified at the hearing.[8] She said she had completed treatment at the Janus Perinatal Program and was just about to graduate from an outpatient program called Sobriety Works, though she would continue to attend that program once a week for aftercare. Mother was attending various addiction programs, such as AA and CMA, three to five times a week and, as of the date of the hearing, had been clean for 221 days. She was also continuing to attend hour-long counseling sessions once a week.

Mother testified that, after her children were first detained, she visited them three times a week, but that was changed to once a month. The children are "always happy to see me. They . . . run up and give me hugs and kisses." She would bring them "little presents" and "healthy snacks," talk to them about school and what they liked to do. Mother would spend time with each child so they each got "quality time" with her. At

---

[8] The social worker was available to testify but counsel waived cross-examination.

the end of the visits, she would tell them she loves them and they would reply, " 'I love you too, mom.' "

On cross-examination, mother testified she developed a heart condition during her pregnancy with O.M. and was in the hospital's intensive care unit for about a week after he was born. She has since been "in and out" of the emergency room due to chest pains, which were diagnosed as "stress."

Mother said she believed she could provide a stable home for the children. When asked if she had a stable home at the moment, she said, "Currently I live at the SLE."[9] She was "looking into getting to the Brennan Street Shelter" and was "also working with families in transition. [*Sic*.]"

Following argument by counsel, the juvenile court denied mother's section 388 petition. The juvenile court found that mother had presented evidence of changed circumstances, but the evidence was not sufficient to show it was in the children's best interests to provide her reunification services.

The juvenile court then heard counsels' arguments on the issue of terminating parental rights, after which it ruled there was clear and convincing evidence that the children were both generally and specifically adoptable. The juvenile court further found that mother did not meet her burden of proof to show that either the beneficial parent-child or the sibling exception applied in this case. Accordingly, mother's parental rights were terminated.[10]

After making its ruling, the juvenile court encouraged the parents to work with the "consortium for children" in order to maintain their contact with the children because "having those loving adults in their lives will be important to those three kids."

Mother timely appealed.

_____

[9] The record does not indicate what this acronym represents.

[10] Father's parental rights were also terminated, but as previously noted, he did not appeal from this ruling.

8

## II. DISCUSSION

Mother raises three arguments on appeal:  (1) the juvenile court ignored substantial evidence that the beneficial parent-child relationship exception applied; (2) the juvenile court ignored substantial evidence that the sibling relationship exception applied; and (3) the juvenile court improperly relied on the social worker's report that the prospective adoptive parents were open to postadoption contact between mother and the children.

Before we address the merits of her claims, we briefly review the applicable statutory framework as well as the standard of review.

### A.     *Statutory framework and standard of review*

After reunification services are terminated, " 'the focus shifts to the needs of the child for permanency and stability.' " (*In re Celine R*. (2003) 31 Cal.4th 45, 52.)  A hearing under section 366.26 is held to design and implement a permanent plan for the child.  At a section 366.26 hearing, the court must terminate parental rights and order the child placed for adoption if it determines, under the clear and convincing standard, that it is likely the child will be adopted.  (§ 366.26, subd. (c)(1).)

Adoption is the preferred choice during the section 366.26 stage of the dependency proceeding.  (*In re Celine R*., *supra*, 31 Cal.4th at p. 49; § 366.26, subd. (c)(1).)  A statutory exception to the general rule requiring the court to choose adoption exists where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)) because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id*., subd. (c)(1)(B)(i).)  Another exception is where "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling,

9

and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (*Id*., subd. (c)(1)(B)(v).)

This court has determined that review of the applicability of exceptions under section 366.26 is governed by a hybrid substantial evidence/abuse of discretion standard of review. (*In re Bailey J*. (2010) 189 Cal.App.4th 1308, 1314-1315 (*Bailey J*.).)

"Since the proponent of the exception bears the burden of producing evidence of [its] existence . . . , which is a factual issue, the substantial evidence standard of review is the appropriate one to apply to this component of the juvenile court's determination. Thus, . . . a challenge to a juvenile court's finding that there is no beneficial relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.' [Citation.] Unless the undisputed facts established the existence of a beneficial parental . . . relationship, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed. [¶] The same is not true as to the other component of . . . the parental relationship exception . . . [, which] is the requirement that the juvenile court find that the existence of that relationship constitutes a '*compelling reason* for determining that termination would be detrimental.' (§ 366.26, subd. (c)(1)(B), italics added.) A juvenile court finding that the relationship is a 'compelling reason' for finding detriment to the child is *based* on the facts but is not primarily a factual issue. It is, instead, a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. [Citation.] Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*Bailey J*., *supra*, 189 Cal.App.4th at pp. 1314-1315.)

" ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the

facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319.)

In sum, the hybrid standard of review enunciated in *Bailey J*. explains how a juvenile court should weigh the various factors in determining if an exception to adoption exists, and how an appellate court should review its decision. From the plain meaning of the statute, it is clear the Legislature intended to give courts discretion to determine whether the exceptions listed in section 366.26, subdivision (c)(1)(B)(i)-(iv), including the beneficial parent-child and sibling relationship exceptions, constitute a "compelling reason for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).)

### B. *No error in rejecting parent-child beneficial relationship exception*

In deciding whether the parent-child beneficial relationship exception applies, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575.) "If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid*.) The parent-child relationship must "promote[] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Ibid*.)

A parent claiming the applicability of the parent-child relationship exception has the burden of proof. (See *In re C.B*. (2010) 190 Cal.App.4th 102, 133-134.) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D*. (2000) 78 Cal.App.4th 1339, 1350; see *In re Celine R*., *supra*, 31 Cal.4th at p. 53.)

11

The parent-child relationship "exception does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1348.) "[A] child should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree but does not meet the child's need for a parent." (*Id.* at p. 1350.) Even a "loving and happy relationship" with a parent does not necessarily establish the statutory exception. (See *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419.)

"The *Autumn H.* standard reflects the legislative intent that adoption should be ordered unless exceptional circumstances exist, one of those exceptional circumstances being the existence of such a strong and beneficial parent-child relationship that terminating parental rights would be detrimental to the child and outweighs the child's need for a stable and permanent home that would come with adoption." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) "[T]he *Autumn H.* language, while setting the hurdle high, does not set an impossible standard nor mandate day-to-day contact." (*Ibid.*) "Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship. A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction." (*Ibid.*)

In order to demonstrate the children would benefit from a continued relationship with her, mother needed to demonstrate that maintaining the parent-child relationship would promote the children's well-being, outweighing the emotional benefits the children would gain in a permanent home with adoptive parents. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) In determining whether the relationship between parent and child is beneficial, we look to such factors as "(1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction

12

between the parent and the child, and (4) the child's particular needs." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.)  The court's conclusion that mother did not satisfy the second prong of the exception "turns on a failure of proof at trial, [such that] the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

The children had been living with their foster parents for more than 18 months, had bonded with them and enjoyed living with them.  The children viewed the foster parents as their source of security and comfort.  Mother's interactions with the children were positive, and there was certainly evidence that the children enjoyed their monthly visits with her.  Mother said the children called her mom and their visits often ended with hugs and kisses.  However, frequent and loving contact with the children does not necessarily establish the existence of a benefit from continuing the parent-child relationship. (*In re Beatrice M.*, *supra*, 29 Cal.App.4th at p. 1418.)  Mother must also demonstrate she occupies " 'a parental role' " in the children's life, which she failed to do.  (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108.)  Mother did not provide any evidence, aside from the fact that the children enjoyed visiting with her once a month, showing they would be severely harmed if their relationship with her was severed.  Her love and concern for her children "do not equate to the day to day care and devotion the average parent expends on behalf of children." (*In re Debra M.* (1987) 189 Cal.App.3d 1032, 1038.)  Accordingly, substantial evidence supported the juvenile court's conclusion that mother failed to show that the children would benefit from continuing the relationship with her.

Furthermore, even if mother had satisfied her burden to establish a beneficial parent-child relationship existed, her claim would still fail because the trial court would not have abused its discretion in finding that the exception did not present a "compelling reason for determining that termination would be detrimental to the child." (§ 366.26,

13

subd. (c)(1)(B).)  There is no dispute that the children were adoptable, and the foster parents were ready and willing to adopt all three.  Moreover, mother previously failed to reunify with another child due, at least in part, to her abuse of drugs.  Although she testified she had been clean for over 200 days at the time of the hearing, mother did not yet have a stable housing situation and had been to the emergency room several times because of "stress."

In contrast, the foster parents had taken care of the children for an extended period of time, the children were strongly bonded with them, and the two older children had expressed a clear desire to remain in their care and be adopted by them.  The court's conclusion that severing the parent-child relationship in this situation would not deprive the children of a substantial, positive emotional relationship such that they would be greatly harmed did not exceed the bounds of reason.  (*In re Autumn H*., *supra*, 27 Cal.App.4th at p. 575; *In re Stephanie M*., *supra*, 7 Cal.4th at pp. 318-319.)

Aside from showing that the children enjoyed visits with her, mother failed to demonstrate they were attached or bonded to her or that they would suffer detriment as a result of terminating her rights.  Accordingly, we find the juvenile court did not err in rejecting the beneficial parent-child relationship exception.

*C.*      *No error in rejecting sibling relationship exception*

Mother also argues that the juvenile court erred in terminating parental rights to the children because in so doing the court severed the relationship between those children and her youngest child, O.M.  We disagree.

To establish this exception the parent must show:  (1) the existence of a significant sibling relationship; (2) that termination of parental rights would substantially interfere with that relationship; and (3) that it would be detrimental to the child being adopted if the relationship ended.  (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952, and see *In re Celine R*., *supra*, 31 Cal.4th at p. 54.)  As with the parent-child exception, the parent asserting the sibling relationship exception has the burden of proof.  (*In re Andrea R*.,

14

*supra*, 75 Cal.App.4th at p. 1108.)  If the parent makes this showing, then the juvenile court balances the benefit to the child of continuing the sibling relationship against the benefit of adoption.  (*In re L. Y. L.*, *supra*, at pp. 952-953.)  However, even if a sibling relationship exists that is so strong its severance would cause the child detriment, the court may still conclude that the detriment is outweighed by the benefit of adoption.  (*Ibid.*)  It is a "rare" case in which the court will find that this exception to adoption applies.  (*In re Valerie A*. (2007) 152 Cal.App.4th 987, 1014.)  "Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies."  (*Bailey J*., *supra*, 189 Cal.App.4th at p. 1315.)

In this case, the evidence presented supported the court's conclusion that the sibling exception did not apply to prevent adoption.  The court considered the opportunity for the three children to be adopted together, and to be part of a stable, permanent family.  Guardianship or long-term foster care could not ensure that the three children could remain together in an emotionally secure and stable home; rather, such a placement would increase the likelihood of disruption in the children's lives.  Adoption was the only option that would ensure permanency for the children.

We agree that there was some evidence presented that the three children were fond of O.M., who had been living with them in their foster home since shortly after his birth in March 2015.  However, mother did not present any evidence to show that any of the three children were closely bonded to their half-brother, let alone that it would be detrimental to the children if their relationship to O.M. were ended.

Maintaining sibling relationships is extremely important.  (See *In re Erik P*. (2002) 104 Cal.App.4th 395, 404.)  However, in the present case, maintaining a sibling relationship with their infant half-brother did not outweigh the benefit the children would enjoy through the permanence of adoption in one family.  (See *In re L. Y. L.*, *supra*, 101 Cal.App.4th at pp. 951-952.)

15

We find that the court did not abuse its discretion when it found that the benefits to the children of adoption outweighed the detriment that could occur as a result of losing their legal relationship with O.M.

### D. *No reliance on postadoption contact*

Mother's final argument is that the juvenile court, in deciding to terminate her parental rights, improperly relied on evidence that the foster parents were willing to allow postadoption contact between her and the children. We disagree.

Mother's citation to the record does not show that the juvenile court improperly relied on the foster parents' willingness to allow postadoption contact with parents in reaching its conclusions in this case. Instead, the juvenile court's comments on the matter were made at the conclusion of the hearing, after it had ruled, and only came in response to the following statements by minors' counsel: "*Now that the Court has ruled*, I would encourage both parents to have contact with the consortium for children as soon as possible because they're [i.e., the foster parents] still open . . . to trying to work out some contact agreement what [*sic*] makes sense so your kids can keep in contact at least in some manner that's safe and appropriate that everybody perhaps can agree to. . . . [¶] . . . [¶] . . . That's on behalf of the kids." (Italics added.) At that point, the juvenile court responded, "I want to echo that, that the parents need to follow through on that. You know, having those loving adults in their lives will be important to those three kids for the rest of their lives. And so I just encourage you to take advantage of that."

There is no evidence the juvenile court relied on the prospect of postadoption contact in making its decision in this case. Absent contrary evidence in the record, we presume the juvenile court correctly followed the law. (See Evid. Code, § 664 ["It is presumed that official duty has been regularly performed"]; *Ross v. Superior Court* (1977) 19 Cal.3d 899, 913.)

16

**III.    DISPOSITION**

The orders of the juvenile court terminating mother's parental rights to A.X., H.X., and L.X. are affirmed.

_____

Premo, J.

WE CONCUR:

_____

Rushing, P.J.

_____

Márquez, J.