Filed 12/10/15  In re B.B. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re B.B., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D067932 |
| Plaintiff and Respondent, | (Super. Ct. No. SJ11454A) |
| v. | |
| A.B., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Michele Ann Cella, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Daniela Davidian, Deputy County Counsel, for Plaintiff and Respondent.

Dependency Legal Group of San Diego, Tilisha Martin, Carolyn Levenberg and Susan Lake for Minor.

A.B. (Mother) appeals the order terminating her parental rights to her daughter, B.B. (B.). (Welf. & Inst. Code, § 366.26.)[1] Mother alleged the court erred because it misapplied the beneficial sibling bond exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(v)) when assessing whether termination was proper. We conclude the court did not misapply the statutory scheme and affirm.

I

FACTUAL AND PROCEDURAL SUMMARY[2]

A. Background

B. was born in August 2003. At that time, Mother's breast milk tested positive for methamphetamine, but Mother declined voluntary services after she was released from the hospital. A dependency proceeding was filed in 2005 and B. was removed from Mother's custody, and placed with her relative caregiver (Grandmother) for three months before being placed back with Mother. However, by September 2006, B. had again been removed from Mother's care and placed with Grandmother, and Mother was offered reunification services, but made no substantive progress. In mid-2008, the court ordered a permanent plan for B. of legal guardianship with Grandmother, and terminated

_____

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     We set forth only those facts relevant to the court's permanency planning ruling.

2

jurisdiction.  B. has remained in Grandmother's home since being placed there in September 2006.

      B. The Current Proceedings

In August 2014 Mother and Grandmother filed section 388 modification petitions. Mother's petition asserted that, based on changed circumstances, the court should change its 2008 guardianship order to allow visitation between B. and Mother.  Grandmother's petition asked to modify the 2008 order to allow Grandmother to legally adopt B.  The report filed by the Health and Human Services Agency (Agency) on the competing modification petitions recommended the court reinstate dependency jurisdiction, set a section 366.26 hearing, and continue Mother's petition to allow the Agency to assess Mother's request for visitation.

The court entered a September 17, 2014, order reinstating the dependency case, granting Mother supervised visitation,[3] and setting a section 366.26 hearing for January 2015.  The Agency's Assessment Report (the Report), dated January 14, 2015, and filed in connection with the section 366.26 hearing, stated B. was thriving in her placement in Grandmother's home, as well as at school and in her community.  In the five and one-half years after B. was placed with Grandmother under guardianship, B.'s contact with Mother and her brothers was inconsistent: B. never resided with her brothers, and her visits with them over those years occurred only in conjunction with Mother's irregular visits with B. From December 2013 through November 2014, B. had no contact with her brothers.

---

3    At a hearing two weeks later, the court ordered supervised visits up to one time per week, and Mother withdrew her section 388 petition.

There were three supervised visits between B. and Mother during November and December 2014, at which her brothers were in attendance. The Report indicated B. enjoyed the company of her brothers, and played and interacted with them, but separated easily from them at the end of the visits. Although B. stated she loved and missed her brothers and enjoyed their time during the visits, she continued to express a desire to be adopted by her current caregiver. The Report also noted Grandmother understood B.'s emotional, developmental and educational needs, and was committed to providing her a safe and stable home; and concluded Grandmother was capable and motivated to do this for B., and that she was thriving in Grandmother's care. The Report concluded that neither the parent-child relationship nor the sibling relationship outweighed the benefits to B. of adoption, and therefore recommended the court terminate Mother's parental rights and order adoption as B.'s permanent plan.

In an Addendum Report (the Addendum), dated April 1, 2015, and filed in connection with the continued section 366.26 hearing, the Agency reported there were three more visits with Mother, B., and B.'s brothers scheduled for February and March 2015. At the February visit, B. greeted her brothers with hugs and played with them during the visit, but B. and one brother got into an argument and the brother acted inappropriately and angrily toward B. At the next visit in mid-March 2015, B. again greeted her brothers happily, but their interactions were rough and required substantial adult intercession to attempt to redirect their behavior but the boys continued to engage in unsafe and inappropriate behaviors. At points during the visit, B. appeared agitated and upset with her brothers and went alone to the visitation area and play structure. The

4

brothers also appeared upset at the attempts by Mother to redirect their behavior, with one brother asking "[c]an we just end this visit and go" and stating "I don't want to be here anymore" and "can we go," and telling B. "I hate you." At the end of the visit, when the children were told to clean up the play area, one brother kicked B. in the side of her abdomen and knocked the wind out of her, causing her to cry, and the brother refused Mother's instruction to apologize to B. After the visit, B. told the social worker she wanted to see her brothers again, and that she worried about them.

The final visit was scheduled for the following week, but Mother did not appear, and repeated efforts to reach her were unavailing. B. told the social worker that, although she still hoped to see her brothers, she wanted to be adopted by Grandmother.

The Addendum also reported that, after many years of turbulence and uncertainty in B.'s placement, B.'s time with Grandmother had brought stability and progress in her life. However, the turbulence from the reinstatement of the dependency proceedings had caused some regression, including depression, stress, and an incident in which B. (after a brief phone conversation earlier that day with Mother) acted out by setting a small fire in her bedroom. The Addendum included that, although B. would be sad if she could not see her brothers, she reaffirmed her desire to be adopted. The Addendum concluded that severing the sibling relationship would not cause significant harm to B., and the relationship is not so significant as to outweigh the benefits of the stability that adoption would provide to her.

C. <u>The Contested Section 366.26 Hearing</u>

At the contested permanency planning hearing, Mother argued against terminating parental rights because the sibling relationship exception under section 366.26, subdivision (c)(1)(B)(v), should be applied.[4]  The court found, by clear and convincing evidence, that it was likely B. would be adopted and that the statutory exceptions did not apply.  The court ordered adoption as the permanent plan for B. and ordered parental rights terminated.

ANALYSIS

A. <u>Legal Framework</u>

At the permanency planning stage of juvenile dependency proceedings, the court must determine by clear and convincing evidence whether the child is adoptable. (§ 366.26, subd. (c)(1).)  If it concludes the child is likely to be adopted, the court must select adoption as the permanent plan unless it finds termination of parental rights would be detrimental to the child under a statutorily-specified exception.  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573-574.)  "The Legislature has . . . determined that, where possible, adoption is the first choice . . . '. . . because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' "  (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)  The parent has the burden to show that one of the statutory exceptions applies.  (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108.)  Where, as here, the

_____

4  Mother argued below that the parent-child bond exception, under section 366.26, subdivision (c)(1)(B)(i), also applied.  However, Mother does not on appeal contest the court's rejection of that exception and we do not further examine it.

6

juvenile court determines the parent has not met that burden, we affirm its determination if supported by substantial evidence. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 250-251.)

The exception relied on by Mother is contained in section 366.26, subdivision (c)(1)(B), which provides that termination of parental rights shall not be ordered if the court finds a "*compelling* reason for determining that termination would be detrimental to the child" because "[t]here would be *substantial interference* with a child's sibling relationship . . . ." (§ 366.26, subd. (c)(1)(B)(v), italics added.) When assessing whether there would be such substantial interference, the court must "tak[e] into consideration the nature and extent of the relationship, *including*, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (*Ibid.*, italics added.)

This exception contains "strong language creating a heavy burden for the party opposing adoption." (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.) When considering the sibling relationship exception, the focus is on the best interests of the child being considered for adoption. (*In re Naomi P.* (2005) 132 Cal.App.4th 808, 824.) Thus, "even if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption." (*Id.* at p. 823.)

7

The court must thus make two interrelated determinations: is there a significant sibling relationship and, if so, would the severance of that relationship be so detrimental to the child that the detriment outweighs the benefits of adoption? (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 952.) As this court observed, "[m]any siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*Ibid.*) Even where siblings had lived together and "had similar experiences," and the child "loved [her brother] and they were very close [and the child] said she would be sad if [they were separated] and would miss him and worry about his safety," the record does not compel the conclusion the sibling exception applied to preclude adoption when "there was no evidence [the child], other than being sad, would suffer detriment if the relationship ended." (*Ibid.*)

B. <u>Analysis</u>

Mother argues the trial court applied an erroneous standard when it evaluated whether the sibling exception applied because it stated it was "rely[ing] heavily on the fact that these siblings have never, ever lived in the same home together as a family" when it concluded the exception did not apply. From that premise, Mother argues the trial court believed a precondition to the sibling exception was that the children have resided together at some time during their lives, and that belief is erroneous. Residing together is not a *necessary* condition to the exception contained in section 366.26, subdivision (c)(1)(B)(v) (see *In re Naomi P., supra*, 132 Cal.App.4th at p. 824), but it is *a* relevant consideration in the matrix of factors when considering the applicability of that

8

exception. (*Ibid.*) The Agency argues, and we agree, that the full context of the trial court's ruling shows it understood the proper standard, because the trial court observed:

> "The sibling exception lists *a number* of circumstances that would have to occur if the exception applied: whether the child was raised with the siblings in the same home, whether they shared significant common experiences, whether there [are] close and strong bonds, [and] whether the ongoing contact is in the child's best interest. [¶] I don't see—I rely *heavily* on the fact that these siblings have never, ever lived in the same home together as a family, that they've established a relationship mainly through visitation . . . ."

The above passage shows both that the trial court correctly understood *all* of the factors it was to consider, and stated it was relying "heavily"—*not exclusively*—on the absence of cohabitation to evaluate the strength of the sibling bond, as well as the fact that whatever relationship they *had* established was "mainly through visitation," which was sporadic and infrequent. Moreover, the court's later observations confirmed it did not simply jettison the exception based solely on the lack of cohabitation, but instead properly juxtaposed the benefits of maintaining the sibling relationship against the benefits of adoption, in accordance with the standards applicable to the statutory scheme.[5] Accordingly, we reject Mother's claim that the trial court misunderstood the proper standards to be applied in the section 366.26 hearing.

Mother also appears to suggest there was no substantial evidence to support the trial court's finding that the sibling relationship exception did not apply here, arguing

---

[5] The court observed that, although B. said she loved her brothers and enjoyed contact with them, she confirmed that if she had to choose between continued contact or adoption, she stated, in so many words, that " 'I really, really want to be adopted.' So it seems like she herself answered the question in terms of that analysis."

there was "abundant evidence of [B.'s] bond to her brothers." However, the nature and strength of that bond is only half of the equation, because the court must weigh that interest against B.'s interest in the security and permanence of adoption. (*In re K.P.* (2012) 203 Cal.App.4th 614, 621-623.) It was Mother's burden to show that one of the statutory exceptions applied (*In re Andrea R., supra,* 75 Cal.App.4th at p. 1108), and where (as here) the court determines the parent has not satisfied the burden, we may not reverse that determination unless the parent demonstrates that determination was an abuse of discretion. (*In re K.P.,* at pp. 621-623.)

We are unconvinced the trial court's determination—that B.'s interest in the security and permanence of adoption was not outweighed by her interest in maintaining her relationships to her brothers—was an abuse of discretion. There was ample evidentiary support for the determination (unchallenged by Mother on appeal) that B.'s interest in the security and permanence of adoption was strong, from both the social worker's assessment and from B.'s expressed desire to be adopted notwithstanding her knowledge of the potential impact it might have on her sibling relationships. Against that interest, B. did have some relationship to her brothers. However, it was not a relationship rooted in having lived together, having shared significant common experiences or having existing close and strong bonds (§ 366.26, subd. (c)(1)(B)(v)), but instead was a relationship limited to one developed during visitations that were at best sporadic and, for nearly a year before the last five visits, nonexistent. Although this relationship generated feelings of affection in B. toward her brothers, the latter five visits showed it was not a particularly strong bond, because they were marked by negative interactions and periods

10

when B. (despite knowing her time with them was extremely limited) chose to be alone, and she separated easily from her brothers at the end of those visits.  On this record, Mother has not shown the trial court's determination—that the benefit to B. of ongoing contacts with her brothers did not outweigh the benefit to B. of the legal permanence provided by adoption—was an abuse of discretion.

## DISPOSITION

The order is affirmed.

McDONALD, J.

WE CONCUR:

HUFFMAN, Acting P. J.

NARES, J.

11