Filed 11/12/13  In re Jordan W. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re JORDAN W. et al., Persons Coming Under the Juvenile Court Law. | |
| | B248813 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK65309) |
| Plaintiff and Respondent, | |
| v. | |
| LISA W., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Amy Pellman, Judge.  Affirmed.

Roland Koncan, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

Appellant Lisa W. (Mother) appeals the order terminating her parental rights under Welfare and Institutions Code section 366.26 over her two children, 14-year old Jordan and 11-year old "Jamie."[1]  Finding no error, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

The children were adopted by Mother and her former husband (Father) after being removed at birth from their biological parents due to pre-natal drug exposure.  In 2006, a dependency proceeding was commenced as the result of physical abuse by Mother, domestic violence between Mother and Father, Father's abuse of alcohol, and Mother's abuse of methamphetamine.[2]  Mother completed services and reunited with the children in February 2009.[3]

The Department of Children and Family Services (DCFS) became involved with the family again in June 2011, when Jordan arrived at school with a black eye. He was questioned and revealed that Mother had hit him with a belt.  He further reported that she regularly hit him with a belt as a form of discipline, leaving purple and red marks on his body, and would close the doors and windows so no one would hear.  Jordan had a bruise on his leg where Mother hit him with her

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.  To preserve the girl's privacy, we use a pseudonym instead of her rather unusual name.

[2]  The petition sustained in 2006 included allegations that "[o]n numerous occasions," Mother had abused Jordan by striking him with a belt and a hanger, and had abused Jamie by striking her with a belt.  There had been four earlier referrals alleging physical abuse of the children, in September 2004, April 2005, and January and April 2006.  On the first occasion, Jordan had a black eye; on the second, he had marks on his face and arm.  The 2006 referrals included the allegation that Mother had hit four-year old Jamie with a paddle, with sufficient force to break the paddle.  In 2007, during the prior dependency proceeding, Jamie returned from an overnight visit with a bruise on her cheek from having been slapped by Mother.

[3]  Mother and Father separated prior to the children's return, and Father has had only occasional contact with the children since.  He is not a party to this appeal.

hand a week earlier. In addition, she sometimes pulled his hair. She warned him not to tell anyone about the abuse or he would be taken away. Jordan and Jamie reported that Mother also hit Jamie with a belt. Mother's male companion reported that Mother hit the children with a belt on their buttocks to "discipline" them approximately once a week. On the day of the most recent incident, Mother claimed to have hit Jordan on the leg with the belt and said that he must have injured his eye in some other fashion.[4] She called her son a "habitual liar" and said he was difficult to discipline due to attention deficit hyperactivity disorder (ADHD).[5]

The children were detained and Mother was provided monitored visitation. DCFS was ordered to immediately begin providing anger management counseling and individual counseling for Mother. In the period following the detention, Mother visited the children regularly. In addition, Mother began attending parenting classes, individual therapy and anger management classes. The children stated they wanted to return to Mother.

Interviewed prior to the jurisdictional hearing, Jordan stated that Mother regularly hit him when he got in trouble, leaving bruises all over his body. She also pulled his hair and dragged him across the floor. On the day he sustained the black eye, Mother's companion had tried to hold her down to stop her from hitting Jordan. Jordan said he wanted a new family or a "nicer" family. Jamie reported being hit and also having her hair pulled. Mother admitted hitting the children with a belt, but said she did not do it regularly and claimed she only hit their buttocks. She claimed it did not hurt them and that they "laugh[ed]" when she did

---

[4]     On the day of the intervention, Mother was arrested for corporal injury to a child and incarcerated for a brief period.

[5]     Mother was not giving Jordan the medication prescribed for his condition, contending it caused him heart palpitations.

it. The caseworker stated that "the children have suffered from years of continued abuse by [Mother]," that Mother "lack[ed] the ability to practice self-restraint and the ability to use proper anger management skills when dealing with her children and her companion," and that despite the services provided, Mother "failed to learn more effective ways of controlling, disciplining, and teaching her children, especially Jordan who has special needs . . . ." DCFS recommended no reunification services for Mother under the exception applicable where there has been a prior proceeding involving the same children and the abuse is repeated. (See § 361.5, subd. (b)(3).)

In September 2011, the court ordered a psychological evaluation of Mother. The court requested the expert to address whether returning the children to Mother was appropriate or likely. The psychologist concluded Mother suffered from no serious mental illness, just "poor coping skills," "low frustration tolerance," and "a chronic, moderate level of depression." The psychologist recommended that Mother be provided reunification services based on the children's attachment to her and her love for them. The psychologist believed that although Mother was "functioning at a very marginal level" and "t[ook] longer than some parents to respond to interventions," she had "the ability and motivation to do so." During the interview, the psychologist learned that Mother had never informed the children they were adopted and had led them to believe she had given birth to them. She recommended that Mother's therapist devise a plan for telling the children the truth.

In November 2011, after several months in foster care, the children were placed with Helen P., a family friend, with whom they had lived during the prior dependency proceeding. The children adjusted well to the placement and felt safe. They began referring to Helen as "Nana" and to Helen's daughter as their "sister." Jordan was enrolled in athletic programs, his academics improved, and he began to

4

enjoy school. Jamie began participating in cheerleading and gymnastics, and making progress in meeting grade level standards. Helen ensured that the children participated in therapy and wraparound services and received the medication prescribed for ADHD.[6]

At the November 2011 jurisdictional/dispositional hearing, the court found true that Mother physically abused Jordan "by repeatedly striking [his] face and shoulder with a belt, inflicting bruising and swelling to [his] eye and shoulder," striking him with belts on numerous prior occasions, and bruising his leg with her hand; the court also found true that Mother abused Jamie by striking her with a belt. The court found jurisdiction appropriate under section 300, subdivision (a) (serious physical harm). The court ordered reunification services for Mother, including an anger management program, individual counseling, conjoint counseling with the children, and parenting classes or group counseling for parents of children with ADHD.

After the jurisdictional/dispositional hearing, Mother participated in all the required programs. On April 12, 2012, she filed a section 388 petition for a modification seeking return of the children under a family maintenance program or unmonitored overnight visits, claiming to have addressed the issues that brought the family before the court. The court set a May 16 hearing on the petition. The caseworker interviewed the children prior to the hearing. Jamie was opposed to unmonitored visits or being returned to Mother; she was afraid Mother would "be like she was before" once services were withdrawn. Jordan seemed ambivalent when asked about unmonitored visitation with Mother or return to Mother and

---

[6] By this time, both children had been diagnosed as having ADHD and the court had approved administration of medication.

became irritated and withdrawn.[7] The caseworker was unable to reach the service providers to confirm Mother's progress. The caseworker expressed concern that Mother had not made sufficient progress and was continuing to minimize or hide her conduct. DCFS recommended six more months of services, more intensive therapy for Mother, and continued monitored visits. The court ordered a contested hearing on visitation and the section 388 petition was withdrawn.

In July 2012, the court directed the children's therapists to tell them they were adopted and to begin conjoint therapy with Mother when the therapists deemed it appropriate. The children were told about their adoption later that month in a joint therapy session. Mother was offered the opportunity to be present, but said she was "not ready." After being informed about their adoption, the children began refusing to visit Mother other than at public or school events. They expressed the belief that Mother had not changed, and that they would be abused again if they returned and would end up back in foster care. They expressed their desire to stay with Helen and to be adopted by her. In November, the court suspended Mother's visitation outside of a therapeutic setting. A few conjoint therapy sessions took place, but the children did not wish to continue. In December, the court found Mother not in compliance with the case plan and terminated reunification services.

By the April 17, 2013 section 366.26 hearing, the children were refusing all interaction with Mother, including telephone calls and conjoint therapy. The caseworker explained that the children had detected no meaningful changes in Mother during their visits. As it could not be said that Mother had a parental role

---

[7] Jamie had indicated to her therapist that she did not feel safe with Mother or trust Mother and did not want to return home or have unmonitored visits. Jamie had also made comments indicating that she suspected she was adopted. Jordan's therapist indicated he became very withdrawn when she attempted to talk to him about his relationship with Mother. He also expressed the view that Mother could not be trusted.

in either child's life or that her relationship with them was beneficial, DCFS recommended termination of parental rights. Mother did not appear at the hearing. Counsel for Mother made the following statement on her behalf: "In light of the order . . . ceasing . . . all Mother's visitation with the children, I explained to [her] that I was not going to be able to raise [the regular visitation] exception, and the children, I believe, are also wanting to be adopted. She would just like me to state, for the record, that she's very sad and that she believes the children have been brainwashed into wanting to be adopted. She would object to [parental] rights being terminated." The court found by clear and convincing evidence that the children were adoptable, that it would be detrimental to return them to their parents, and that no statutory exception to adoption applied. The court terminated parental rights over the children. Mother appealed.

## DISCUSSION

At the section 366.26 hearing, the court may order one of three alternatives for the children -- adoption, guardianship or long-term foster care. (§ 366.26, subd. (b).) If a child is adoptable, there is a strong preference for adoption over the other alternatives. (*Id.*, subd. (c)(1); *San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 884-885.) Here, there was no dispute that the children were likely to be adopted if parental rights were terminated. Accordingly, the burden was on Mother to demonstrate that termination of parental rights would be detrimental to the children under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re T.S.* (2009) 175 Cal.App.4th 1031, 1039.)

Mother contends on appeal that the exception contained in section 366.26, subdivision (c)(1)(B)(i) applied. That provision provides an exception to termination of parental rights where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing

7

the relationship." At the section 366.26 hearing, however, Mother's counsel conceded that regular visitation had not occurred and that this exception did not apply. "The juvenile court does not have a sua sponte duty to determine whether an exception to adoption applies." (*In re Rachel M*. (2003) 113 Cal.App.4th 1289, 1295.) A parent's failure to raise before the juvenile court the regular visitation and benefit from relationship exception (now found in subdivision (c)(1)(B)(i), previously in (c)(1)(A)) results in forfeiture of the issue, and the existence of the exception cannot be raised on appeal. (*In re Melvin A*. (2000) 82 Cal.App.4th 1243, 1252; see also *In re Rachel M*., *supra*, 113 Cal.App.4th at p. 1295 [applying forfeiture rule when parent failed to raise exception applicable where foster parent unwilling or unable to adopt]; *In re Erik P*. (2002) 104 Cal.App.4th 395, 401 [applying forfeiture rule when parent failed to raise sibling exception].) Accordingly, Mother has forfeited this issue.

Moreover, even were we to reach the merits, we would find no error. "'Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.'" (*In re T.S*., *supra*, 175 Cal.App.4th at p. 1039, quoting *In re Jasmine D*. (2000) 78 Cal.App.4th 1339, 1350.) The court must find that the parent-child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents," and that severing the relationship "would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed . . . ." (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 575.)

The evidence was overwhelming that the benefits of adoption by Helen far exceeded any benefit to the children from continuing the relationship with Mother. Mother had physically abused the children throughout their young lives. The

8

children were nine and 11 when they were removed in June 2011, and had been out of her care for almost two years at the time of the section 366.26 hearing. They had previously been out of Mother's care more than two years in connection with the prior proceeding. Despite the services provided from 2006 through 2009, Mother continued to regularly beat the children hard enough to leave bruises and marks. Helen had taken the children into her home twice, and both times had provided an environment where the children felt safe and secure. She ensured that they engaged in healthful activities and that their therapeutic needs were met so they could succeed academically. The children were closely bonded with Helen, whom they called Nana, and her daughter, whom they regarded as a sister.

It is often said that to establish the exception contained in section 366.26, subdivision (c)(1)(B)(i), "the parents must do more than demonstrate 'frequent and loving contact' [citation], an emotional bond with the child, or that the parents and child find their visits pleasant. [Citation.]" (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108-1109, quoting *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1420.) Here, the evidence did not even demonstrate pleasant visits, an emotional bond, or frequent and loving contact. Mother had not visited the children other than in public and therapeutic settings for many months. The children believed her to be unchanged and deceptive. They wanted nothing more to do with her. In this situation, termination of parental rights would have been unavoidable, even had Mother raised the issue of an exception at the section 366.26 hearing.

## DISPOSITION

The order terminating parental rights is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

EPSTEIN, P. J.

SUZUKAWA, J.