Filed 3/16/23  In re C.G. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.G. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E079737 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ001249) |
| v. | OPINION |
| G.G. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Dorothy McLaughlin, Judge.  Conditionally reversed and remanded with directions.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant G.G.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant A.R.

1

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

Appellants A.R. (mother) and G.G. (father), the parents of C.G. and Ga.G., appeal from the juvenile court's order terminating parental rights and freeing the children for adoption. (Welf. & Inst. Code, § 366.26.) They contend the court erred in failing to find the beneficial parent-child relationship exception to adoption applies. (*Id*. at subd. (c)(1)(B)(i).) They also contend the court and the Riverside County Department of Public Social Services (the department) failed in their duties of initial and further inquiry under the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.)[1] and Welfare and Institutions Code section 224.2[2] as to the children's possible Indian heritage. We reject the parents' first contention but agree with their second. Thus, we conditionally reverse the order terminating parental rights and remand the matter to the juvenile court.

## I. PROCEDURAL BACKGROUND AND FACTS

The family has a lengthy child welfare history beginning in 2002 due to the parents' substance abuse and general neglect. In 2018, when mother gave birth to C.G., both tested positive for methamphetamine and opiates. Both parents have an extensive

---

[1] Because ICWA uses the term "Indian," we will do the same for consistency, even though we recognize that "other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M*. (2021) 70 Cal.App.5th 735, 739, fn. 1.)

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

history of using heroin and methamphetamine, and mother admitted to using throughout her pregnancy.

On June 3, 2020, the department initiated this dependency proceeding pursuant to section 300, subdivisions (b)(1) (failure to protect) and (f) (death of a sibling), based on the death of parents' five-month-old son,[3] their abuse of controlled substances, their criminal histories, and the "deplorable" and unsafe conditions in the home.[4] According to the detention report, the parents denied any Indian ancestry. At the June 4, 2020 detention hearing, the juvenile court found father to be the presumed father of C.G., and the parents were ordered to complete the ICWA-020 parental notification of Indian status form. After finding a prima facie case had been made, the court detained C.G., placed her with the paternal grandparents, and ordered supervised visitation for the parents.

On June 10, 2020, mother reported Indian ancestry on the maternal grandfather's side but could not recall the name of the tribe. She provided contact information for the maternal uncle because the maternal grandfather did not have a phone. On June 19, the social worker left a message on the maternal uncle's phone requesting a return call. On July 2, the ICWA noticing clerk contacted mother to gather more information; mother reported that she spoke with her father who informed her the family has no Indian ancestry. Despite his prior denial of Indian ancestry, on June 19, father reported he may

---

[3] A subsequent autopsy report revealed the cause of death to be sudden infant death syndrome.

[4] Mother's two older children were also named in the petition; however, they are not parties to this appeal. The petition was later amended twice, on August 12 and 19, 2020.

have such affiliation, but he did not know the tribe and could not identify any relative that may know.

At the contested jurisdiction hearing on August 19, 2020, the juvenile court found the allegations in the second amended petition true, adjudged C.G. a dependent of the court, stated that the department had conducted a sufficient inquiry regarding the child's Indian ancestry, and found that ICWA does not apply. C.G. was removed from the physical custody of the parents and family reunification services were ordered.

According to the six-month status report filed January 29, 2021, mother was unemployed and on formal probation for a prior conviction, father was employed, and both were irregularly participating in reunification services. Both parents consistently visited C.G.—progressing to four-hour unsupervised visits, three times a week. C.G. was developmentally on target and bonded to the paternal grandmother. On March 15, 2021, at the contested six-month status review hearing, the juvenile court found that ICWA does not apply and that a sufficient inquiry had been made. The court extended reunification services and authorized the department to liberalize visitation to include unsupervised overnight/weekend visits.

In June 2021, mother gave birth to Ga.G.; both tested positive for amphetamines/ opiates despite mother denying any drug use. The department detained Ga.G. pursuant to section 319. Visitation was returned to supervised, two hours a week. On June 15, the department added Ga.G. to the dependency petition under section 300, subdivisions (b)(1) and (j). The department alleged the mother suffers from chronic and unresolved substance abuse issues, which continued throughout her pregnancy and resulted in Ga.G.

4

being hospitalized in the neonatal intensive care unit due to severe withdrawals. According to the detention report, since March 25, the social worker had had no contact with mother who had been removed from MFI for lack of attendance, both parents missed several drug tests, and they denied being registered members of any Indian tribe. On June 16, the juvenile court found that ICWA does not apply to these proceedings, and father is the presumed father of Ga.G. The child was detained, the court ordered visitation to be supervised. That same day, each parent filed an ICWA-020 parental notification of Indian status form, denying any Indian ancestry.

In its 12-month status review report filed July 7, 2021, the department asked the juvenile court to terminate the parents' reunification services and set a section 366.26 hearing. During the review period, the parents were having unsupervised weekly visits totaling 12 hours; however, following mother's and Ga.G.'s positive drug tests, the parents were put back on supervised visits. Except for visitation, the parents had made minimal progress on their case plans. They requested a contested 12-month status review hearing.

In its jurisdiction/disposition report for Ga.G., filed on July 14, 2021, the department recommended the allegations in the petition be found true, Ga.G. be declared a dependent of the court, and the parents be denied reunification services pursuant to section 361.5, subdivision (b)(13). Likewise, it was noted that on July 7, both parents denied any Indian ancestry. Although the parents visited Ga.G. on a daily basis, they lacked "progress with their case plans after twelve months." Subsequently, the parents participated in reunification services and continued to be attentive to the children who

5

loved their parents; thus, the department changed its recommendation to extend services regarding C.G. and offered services regarding Ga.G. On August 26, the juvenile court found the allegations in Ga.G.'s petition true, adjudged her a dependent, removed physical custody from the parents and ordered reunification services.

In its 18-month permanency review report, the department recommended C.G. be placed in the parents' care on family maintenance contingent upon compliance with case plan requirements. On October 20, the parents again denied having any Indian ancestry. The social worker opined that C.G. appears to be happy living with her grandmother, and has a good bond with her parents who consistently engage in supervised visitation. Beginning September 3, the visits were unsupervised, and on October 9, they increased to eight hours. C.G. and Ga.G. visited the parents at their home on the weekend of October 24-25. In the addendum report, the department noted that the parents had an overnight visit with C.G. with no concerns. On November 30, the juvenile court ordered C.G. placed in the parents' care under family maintenance.

On January 11, 2022, the department filed a section 387 petition for C.G., alleging the parents had failed to benefit from services, their home was reported to be in deplorable conditions, and father, who had admitted to recently using marijuana and methamphetamine, was arrested for charges relating to weapons, possession of controlled substances, and child endangerment. On January 7, C.G. was placed with her paternal grandmother. According to the detention report, the department received an immediate response referral from the drug endangered children team; the parents would likely be arrested due to heroin and methamphetamine paraphernalia found throughout the home.

6

The condition of the home was described as "'disgusting.'" Law enforcement found a loaded firearm, methamphetamine, ammunition, two methamphetamine pipes, a box of syringes, foil with burnt residue, and several baggies with methamphetamine residue. When deputies arrived, there was "a large plume of smoke in the master bedroom and it was believed [father] was getting his 'last hits.'" A crib in the room had feces on its side, and there was a bottle with rotten material in it. The bathroom by the children's room was dirty with feces on toilet paper in an overflowing trashcan. There was rotting food and debris throughout the home. An older half sibling saw father smoking what she described as methamphetamine; a local "'tweaker'" was also in the home. Mother admitted to using fentanyl, and there was Narcan[5] in the home; however, she denied seeing any drugs or paraphernalia in the house or seeing father use drugs. Mother blamed law enforcement for her home's condition. An older half sibling stated that C.G.'s father is in the "'cartel'" and is selling drugs, and there were drugs on mother's bed. The juvenile court removed C.G. from the parents' custody and ordered supervised visitation.

In its section 387 jurisdiction/disposition report filed January 31, 2022, the department recommended the juvenile court deny further reunification services because the parents have exceeded statutory timeframes. Similarly, in its six-month status review report for Ga.G., filed the same day, the department recommended the court terminate reunification services for both parents and set a section 366.26 hearing to select a permanent plan. The social worker opined that the parents did not appear to have

_____

[5] A prescription medicine used for the treatment of a known or suspected opioid overdose.

7

benefited from services given the recent police report and living conditions of their home. The parents had placed the children at substantial risk of harm and possible death. The children returned to their paternal grandparents' home where they were happy and well-adjusted, the paternal grandmother was able to meet their needs, and she was willing to provide a permanent home for them.

A contested hearing on both the section 387 petition and the six-month status review report was held on February 24, 2022. The juvenile court sustained the allegations in the section 387 petition concerning C.G., found there was no substantial probability that Ga.G. would be returned to parents' custody if given six more months of services, terminated reunification services, and set a section 366.26 hearing.

According to the selection and implementation report filed June 13, 2022, the department recommended adoption by the paternal grandmother, who was committed to adopting the children. Both parents consistently visited the children—C.G. struggled with separating from them after visits—and wanted to reunify with them; however, if reunification is not an option, the parents preferred adoption by the paternal grandmother. The section 366.26 hearing was set for September 1, and a postpermanency review hearing was set for December 23.

According to the addendums to the selection and implementation report filed on August 4 and August 18, 2022, the department continued to recommend termination of parental rights with the permanent plan of adoption. C.G. had been placed with the paternal grandparents on June 2, 2020, until November 30, 2021, and then again on January 7, 2022; Ga.G. had been placed with them since June 16, 2021. C.G. was

described as a happy toddler, who was comfortable in the paternal grandparents' home; however, they reported that she was "displaying tantrum like behaviors after visits with her biological parents." Ga.G. was also a "happy and giggly toddler," who enjoyed being held by the paternal grandparents. The paternal grandparents were bonded to the children, able to meet their needs, wanted to ensure they are in a safe and loving home, and remained committed to adopting them. Although they were unwilling to enter into a formal postadoption contract agreement, the paternal grandparents noted the value in maintaining "the familial connection between the children and their biological parents and maternal relatives when deemed appropriate." They further "acknowledge[d] and value[d] the sibling connections as evident by their willingness to continue consistent bonding time between them."

On September 1, 2022, the juvenile court summarily denied mother's section 388 petition requesting reinstatement of reunification services on the grounds the request failed to state new evidence or a change of circumstances and did not promote the best interest of the children. The court proceeded with the section 366.26 hearing. The department submitted on its reports. The children's counsel requested termination of parental rights. Both parents asked the court to apply the beneficial parent-child relationship exception (§ 366.26, subd. (c)(1)(B)(i)) and select a plan of legal guardianship. The department acknowledged the parental bond, but argued that it does not override the statutory preference for adoption. The children's counsel acknowledged the parents' consistent visitation, but described them as friendly visitors who have not maintained the parent/child relationship and parent/child role. Counsel asserted that the

9

children have spent most of their lives in the care of the paternal grandparents such that severance of the parental relationship bond would not cause them detriment.

After reviewing the evidence and considering the arguments of counsel, the juvenile court adopted "the findings and orders recommended by the department and terminate[d] parental rights." The court found "a sufficient basis for termination of parental rights exists, based upon findings made at the . . . section 387 jurisdiction/dispositional hearing February 24th, 2022" as to both parents. The court further found that "termination of parental rights would not be detrimental to the [children] in that none of the exceptions contained in . . . section 366.26(c)(1)(A) and/or (B) are applicable." After concluding it was likely the children would be adopted, and that adoption was in their best interests, the court terminated parental rights and ordered adoption as the permanent plan.

## II. DISCUSSION

### A. *Beneficial Parent-child Relationship Exception*

The parents contend the juvenile court erred in terminating parental rights because the beneficial parent-child relationship exception applies. More specifically they assert the order must be reversed because the court made no factual findings and it is unclear whether its ruling complied with *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) in determining whether the beneficial parent-child relationship exception to adoption applied. As we explain, we reject these contentions.

At a permanency planning hearing, once the juvenile court finds by clear and convincing evidence that a child is likely to be adopted within a reasonable time, the

10

court is required to terminate parental rights and select adoption as the permanent plan, unless the parent shows that terminating parental rights would be detrimental to the child under one of several statutory exceptions. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.) One exception is the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) In *Caden C.*, our Supreme Court examined this exception and held that a drug-addicted parent's failure to succeed in drug rehabilitation programs and continuing struggles with addiction did not, on its own, disqualify the parent from being accorded the beneficial parent-child relationship exception. (*Caden C.*, *supra*, 11 Cal.5th at pp. 637-641.) In other words, unless the factors that led to the dependency in the first place also bear on the question of whether a child would benefit from continuing the relationship and be harmed, on balance, by losing it, they are irrelevant. (*Id*. at p. 638.)

Under the beneficial parent-child relationship exception, the parent bears the burden of proving three elements by a preponderance of the evidence: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 631, italics omitted, see *id.*, at p. 636; § 366.26, subd. (c)(1)(B)(i).) If all three elements have been established, the exception applies, and the court should select a permanent plan other than adoption. (*Caden C.*, at pp. 636-637.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for

adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350, disapproved on another ground in *Caden C.*, at p. 636, fn. 5.)

We employ a "'hybrid'" standard of review to the juvenile court's findings on the application of the beneficial parent-child relationship exception. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-641.) The first two elements are primarily factual and reviewed for substantial evidence. (*Id*. at pp. 639-640.) On the third element, the "court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home." (*Id*. at p. 640.) Thus, any factual determinations underlying the juvenile court's evaluation would also be reviewed for substantial evidence, but the court's ultimate balancing of the detriment of severing the parent-child relationship against the benefits of adoption is reviewed for abuse of discretion. (*Id*. at pp. 640-641.)

In the present case, the department concedes the parents established the first two elements—regular visitation and a beneficial relationship. Thus, the issue before us is whether they showed that the harm caused by terminating their parental rights outweighed the benefits of providing the children with a permanent adoptive home. At this stage of the proceedings, the court "must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) In other words, "[w]hen the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id*. at pp. 633-634.)

12

According to the parents, in reaching its detriment conclusion the juvenile court failed to make factual findings. We disagree. The court's findings were not so limited given its adoption of "the findings and orders recommended by the department" and its reference to the "findings made at the . . . section 387 jurisdiction/dispositional hearing February 24th, 2022." Moreover, "we are aware of no requirement—and [the parents cite] no authority supporting the proposition—that the juvenile court, in finding the parental-benefit exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception. To the contrary, we infer from section 366.26, subdivision (c)(1)(D)—under which the juvenile court is required to 'state its reasons in writing or on the record' when it makes a finding that termination of parental rights *would be* detrimental to the child—that the court is not required to make findings when it concludes that parental rights termination *would not be* detrimental." (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156; see *In re Andrea R*. (1999) 75 Cal.App.4th 1093, 1109 [appellate record supported implied finding by juvenile court that parents had failed to establish the beneficial parent-child relationship exception].) Although stated factual findings (reasons) aid our review of a detriment conclusion, it is not a legal requirement.

Considering the evidence presented in support of the findings made at the February 24, 2022 hearing, we cannot say the juvenile court abused its discretion in later concluding that the benefit of adoption outweighed the children's loss of any positive emotional attachment to their parents. (*Caden C*., *supra*, 11 Cal.5th at p. 640.) At the time of the section 366.26 hearing, C.G. had only lived with the parents less than half her

life; Ga.G. had never lived with the parents, having spent her entire young life with the paternal grandparents. Both children were described as happy toddlers, and Ga.G. was meeting her developmental milestones despite her in utero exposure to drugs. While both children were too young to comment on their adoption, they were bonded to the paternal grandparents, who provided a safe living environment.

Nonetheless, in support of their claim that termination of parental rights would be detrimental to the children, the parents rely on the evidence of C.G.'s "tantrums" following visitation. However, the social worker explained that C.G.'s "tantrum like behaviors after visits with her biological parents" stem from her inability to "comprehend the family dynamics, the case process, and the reasoning behind not living or being raised by her biological parents." Moreover, there is no evidence the parents' absence between visits negatively affected her (she had no problem eating, sleeping, or going about her daily life), or that she complained about missing them between visits. Rather, C.G. felt safe and comfortable in the care of the paternal grandparents. In contrast, the parents ignore or downplay the fact that they continued possessing and using marijuana and methamphetamine in their home after C.G. resumed living with them and Ga.G. was present for unsupervised visitation. The condition of their home was described as disgusting, with feces on the side of the crib and in the bathroom and rotting food and debris throughout the home. Also, methamphetamine paraphernalia, a loaded firearm, and ammunition were present.

After considering this evidence and oral argument, the juvenile court weighed the benefit of maintaining a relationship with the parents against the benefit of a permanent

14

and stable home. It found insufficient evidence of detriment to the children to warrant the application of the beneficial parent-child relationship exception. We find no abuse of discretion here.

In short, the juvenile court did not err in finding the beneficial parent-child relationship exception to adoption did not apply.

### B. Failure to Comply with ICWA.

This case involves reversible error because the parties agree, and we concur, there was noncompliance with the inquiry requirements of ICWA and related California provisions. (*In re H.V.* (2022) 75 Cal.App.5th 433, 438; *In re Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.) Here, the department only inquired of the parents and the maternal uncle regarding Indian ancestry. The department failed to ask the paternal grandparents or any extended known maternal and paternal family members about Indian heritage. Pursuant to section 224.2, subdivision (b), both social services agencies had a duty to ask the children's "extended family members" and "others who have an interest in the child[ren]" whether they are Indian children.

### III. DISPOSITION

The juvenile court's September 1, 2022 order terminating parental rights to C.G. and Ga.G. is conditionally reversed, and the matter is remanded for proceedings consistent with this opinion. The juvenile court shall order the department to make reasonable efforts to interview available maternal and paternal family members about the children's Indian ancestry and to report to the court the results of the investigation. Based on the information reported, if the court determines that no additional inquiry or

15

notice to tribes is necessary, the order terminating parental rights is to be reinstated. However, if additional inquiry or notice is warranted, the court shall make all necessary orders to ensure compliance with ICWA and related California law.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

MILLER
J.

RAPHAEL
J.