Filed 5/30/25  In re Jeremiah C. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Jeremiah C. et al., Persons Coming Under the Juvenile Court Law. | |
| SONOMOA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>W.C.,<br><br>     Defendant and Appellant. | A172064<br><br>(Sonoma County Super. Ct. Nos. DEP-5169-01, DEP-5170-01) |

W.C. (Mother) appeals from an order terminating parental rights under Welfare and Institutions Code section 366.26.[1]  She contends the juvenile court erred in denying her section 388 petition and in terminating her parental rights after declining to apply the parental-benefit exception.  We affirm.

---

[1]     All undesignated statutory references are to the Welfare and Institutions Code.

1

## A. The Dependency Petition and Guardianship

In April 2017, the Sonoma County Human Services Department (the Department) filed a juvenile dependency petition alleging Jeremiah C., then 16 months old, and Josiah C.,[2] then 3 months old, came within the jurisdiction of the juvenile court pursuant to section 300, subdivision (b), because Mother's serious untreated mental health issues prevented her from adequately parenting the minors. Specifically, the petition alleged Mother had been diagnosed with post-traumatic stress disorder (PTSD) which manifested in rage, screaming, claims she could see the devil in others, and the failure to attend to the minors' needs. For example, Mother failed to comfort the minors when she scared them by screaming, failed to properly supervise them, failed to change their diapers, and handled them aggressively.

The juvenile court detained the minors. The Department filed a jurisdiction report indicating that Mother was unhoused, that the Department had been unable to contact the minors' father (Father), and that the minors had been placed with their maternal grandmother (Grandmother), who was already the legal guardian of their older brother, L.C. The Department reported that the minors were in an "alarming" state when taken into custody and that Mother's reality is "fragmented" and "distorted." In July 2017, the juvenile court sustained the allegations of the petition, took jurisdiction over the minors, and ordered Mother to complete two psychological evaluations.

---

[2] We will hereafter refer to the minors by their first names only, and collectively as the "minors."

The Department's disposition report indicated Mother's mental health issues made it impossible for her to provide for the needs of herself and the minors, as she was unable to use resources like homeless shelters or similar programs. For her part, Mother refused to participate in voluntary family maintenance services.

In addendum reports, the Department documented the results of Mother's two psychological evaluations: one psychologist concluded her symptoms strongly suggested bipolar disorder, while the second diagnosed her with mild schizophrenia without hallucinations. Both recommended the court bypass Mother for services, as she was unlikely to sufficiently benefit from services within the mandated time period to reunify with the minors.

At the December 2017 disposition hearing, Mother and Father agreed to waive their rights to reunification services and agreed to Grandmother's appointment as the minors' legal guardian. The juvenile court declared the minors dependents, issued letters of guardianship, ordered that both parents receive reasonable visitation as arranged by Grandmother, and dismissed the case.

### B. 2019 and 2022 Section 388 Petitions

In 2019 and 2022, Mother filed three section 388 petitions seeking either to re-open the case and have the minors placed with her, or for additional visitation. The juvenile court denied the first two of these petitions on the ground they did not state new evidence or a change in circumstances. The court denied the last of these petitions because there was no showing regarding Mother's "mental health and other behaviors" or that the requested order was in the minors' best interest.

### C. 2023 Section 388 Petition

In March 2023, Mother filed a section 388 petition seeking to terminate the guardianship, or for immediate unsupervised visitation with L.C. and the minors. In addition to reiterating the changed circumstances alleged in her prior section 388 petitions—e.g., that she had stable housing and regularly participated in therapy—Mother indicated she had a reliable car, was writing a book, had taken parenting classes, stopped smoking, and had legal custody of L.C. whose guardianship was terminated in October 2022. Mother claimed that Grandmother cut off visitation with the minors after Mother obtained custody of L.C. The court set an evidentiary hearing to consider the petition.

The Department submitted a report recommending denial of Mother's request to terminate the guardianship. The Department reported the minors had lived with Grandmother most of their lives and had a healthy attachment to her that was not in their interests to dissolve. The Department recommended the only change to visitation should be the scheduling of one supervised visit, to assess the minors' response to seeing Mother. The Department further requested that the court reopen the cases and set a section 366.26 hearing because Grandmother wanted to adopt the minors.

On June 6, 2023, the juvenile court denied Mother's request to dissolve the guardianship but reserved the issue of visitation and the Department's request to set a section 366.26 hearing. In the meantime, the court ordered that Mother receive weekly supervised visits. Prior to the next hearing, Mother received four visits. Josiah declined to attend two of them, but Jeremiah went to all four. The visits went well, and the minors exhibited no distress upon departing. Sometime after the first visit, Jeremiah displayed regressive behaviors, such as sucking his thumb, asking Grandmother to hold

4

him like a baby, and soiling his pants at night.  After one visit, Josiah had a "significant melt down," which was very unusual.

On July 6, 2023, the juvenile court denied Mother's section 388 petition and reduced visits from weekly to monthly supervised in-person visits, plus supervised monthly phone calls.  The court set a hearing for October to review visitation.

The Department filed an addendum report addressing visitation. Mother's first visit went well, though neither minor responded when Mother told them she loved them at the end of the visit.  After the visit, Josiah looked upset and indicated he did not like being away from Grandmother; Jeremiah asked what would happen if Grandmother did not come.  Grandmother reported Josiah had a nightmare that week about being taken away.  The minors' therapist reported that after the August 2023 visit, both minors said they preferred monthly rather than weekly visits.  Josiah did not like visiting with Mother.

In October 2023, Mother filed another section 388 petition asking for increased visitation, which the court denied.  The court set a section 366.26 hearing.

**D.  The 2024 Section 366.26 Report and Section 388 Petition**

In February 2024, the Department filed a section 366.26 report recommending the juvenile court terminate Mother's and Father's parental rights and order adoption as the minors' permanent plan.  The Department indicated, per Jeremiah's therapist, that Jeremiah had not changed his mind about wanting to see Mother only once a month and was worried about being taken from Grandmother.  As for Josiah, he repeatedly expressed worry about being taken from Grandmother.  Jeremiah had attended all seven available monthly visits, while Josiah attended only two.

5

Department social worker Ellie Campbell-Brown reported Jeremiah displayed an "insecure" and sometimes "disorganized" attachment to Mother that was "moderate to weak in strength." Though neither minor had "a substantial, positive, secure, emotional attachment" to Mother, both clearly had a substantial, positive, secure, emotional attachment to Grandmother.

In March 2024, prior to the contested section 366.26 hearing, Mother filed a section 388 petition asking for Jeremiah's return to her, increased visitation, and reunification services. The court ordered the petition would be heard directly before the contested section 366.26 hearing.

### E.  The June 10, 2024 Combined Hearing

The contested hearing to address Mother's section 388 petition and the Department's request to terminate parental rights began on June 10, 2024. Mother orally moved to amend the section 388 petition to include both minors. The juvenile court took judicial notice of the file, which included the Department's visitation notes. The following is a brief summary of some of the testimony at this initial hearing.

L.C. testified when he was living with Grandmother, the minors generally had weekly visits with Mother, but if they asked for more, Grandmother would "shut it down for a long time." L.C. indicated that Jeremiah asked for more visits, but Grandmother would give him a "time out," then postpone visits for a month or a couple of weeks.

A representative from Family, Youth and Children Services who observed six visits testified the minors did not initiate engagement during visits, and did not hug or say goodbye to Mother without prompting. Typically, visits would end with prompted goodbyes to Mother, then the minors would run to Grandmother. Jeremiah did respond, however, when Mother engaged with him. During one visit, after Mother said she was

6

moving to Los Angeles, Jeremiah appeared to experience fear and anxiety. The minors were generally anxious around visits.

A social worker and mentor for Mother who observed all the visits, testified the minors were very engaged with Mother, and they had good visits.

Mother testified regarding her housing stability, her progress in school, and her ministry activities on social media. Mother indicated it would be in the minors' best interests to live with her because she was their mother, and she wanted the minors to be with L.C. During visits, Jeremiah always showed affection without prompting, and the minors always engaged with her. When Mother told Jeremiah about her move to Los Angeles, he initially got anxious and asked if they would still see each other, but she assured him they would and he seemed fine and moved on. At the contested hearing, when asked by Grandmother's counsel if she intended to move the minors to Los Angeles, Mother refused to answer the question.

Ellie Campbell-Brown, the assigned social worker, testified generally that Josiah is nonresponsive to questions about Mother. Jeremiah is more willing to talk about Mother, but he tends to speak of the activities he did during visits rather than her. Jeremiah expressed concern about visits with Mother ceasing, but he also asked several times if he would be able to visit Campbell-Brown if the case was dismissed. The minors have a close relationship with Grandmother and removing them would be detrimental. Josiah's connection with Mother is "not very strong," and Jeremiah has a lot of anxiety and a "difficult relationship" with Mother. Campbell-Brown reported that Mother had made tremendous progress with her mental health,

but still struggled with emotional regulation.  She recalled seeing Mother have "many outbursts," though not any directed at the minors.[3]

At the end of the hearing, the juvenile court continued the matter for a bonding study.

**F.  Bonding Study**

In November 2024, the Department filed an addendum report.  The attached bonding study, prepared by psychologist Dr. Tiffany Anderson, addressed:  (1) whether the minors have a substantial, positive, emotional attachment to Mother implying the children would benefit from continuing the relationship; and (2) whether termination of parental rights would be detrimental to the children due to the relationship with Mother.

The bonding study included documented interviews with Mother and others.  Josiah chose not to participate in the bonding assessment and reported he does not like to visit with Mother.  Grandmother stated that unlike Josiah, Jeremiah always wants to go to visits with Mother, but he had negative behaviors or experiences after visits.

According to the minors' therapist, Josiah does not want a relationship with Mother, does not like the court system being involved in his life, and is scared of being taken from his home with Grandmother.  Jeremiah wants visits with Mother and described their time together as " 'good,' " but he experiences various behaviors around the visits, such as incontinence at night and outbursts in class or at the park  Though Jeremiah deeply loves

---

[3]     During both this hearing and the continued hearing in November 2024, Mother had repeated outbursts in which she yelled at, interrupted, and swore at the juvenile court, the attorneys, the court reporter, and the witnesses.  At one point, the court muted Mother numerous times before removing her temporarily from the November 2024 contested hearing.

Mother and wants a relationship with her, he wants to live with Grandmother. Both minors want to be adopted by Grandmother.

The bonding study concluded "the parent-child relationship for Jeremiah appears characterized by moderately positive yet relatively weak attachment to [Mother]. The parent-child relationship for Josiah appears characterized by moderately negative and weak attachment to [Mother]." (Boldface omitted.) The evaluator did not believe termination of Mother's parental rights would be detrimental to the minors and concluded the prospect of future visitation did not appear to sustain the minors' emotional stability or well-being. And even though the minors may be affected in the short term, the evaluator did not think it likely that "discontinuing contact with [Mother] would greatly harm Jeremiah and Josiah's long-term well-being, nor deprive the minors of a substantial positive emotional attachment." In sum, the evaluator opined that keeping the minors in a relationship with Mother "does not outweigh the benefits of stability/permanency of adoption for either child."

**G. The November 18, 2024 Combined Hearing**

At the continued hearing on November 18, the juvenile court again took judicial notice of the court file, including the bonding study and the Department's reports. Mother testified she had a stronger relationship with Jeremiah than Josiah. She expressed disagreement with the bonding study.

Dr. Anderson testified that Jeremiah's bond with Mother was similar to that with any other familiar adult. At the end of the observed visit with Mother, Jeremiah exhibited no distress and did a "fist pump" and was excited when Mother left. Jeremiah's post-visit dysregulation suggested distress related to the visits, but such occurrences appeared inconclusive as to whether his bond with Mother is positive or negative. Dr. Anderson believed

9

the distress was related to inconsistency and uncertainty in the relationship with Mother and the court process. With regard to L.C.'s testimony that the minors were discouraged from asking for more visits with Mother and whether their lack of talking about Mother was their "true emotional position," Dr. Anderson indicated it was possible such factors could have impacted the minors' willingness to talk about Mother, but expressed doubt that this would substantially change the opinion in the report.

Ultimately, the juvenile court denied Mother's section 388 petition, declined to find the parental-benefit exception applicable, terminated parental rights, and ordered a permanent plan of adoption for the minors. Mother appealed.

## DISCUSSION

### A. Section 388 Petition

Section 388 provides that a parent of a child who is a dependent of the juvenile court "may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court . . . ." (§ 388, subd. (a)(1).) To obtain relief under section 388, the petitioner must show, by a preponderance of the evidence, "a change of circumstances and that modification based on that change would be in the 'best interests' of the minor children." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 526; *In re A.S.* (2009) 180 Cal.App.4th 351, 357.)

"In determining whether the petitioning party has carried his or her burden, 'the court may consider the entire factual and procedural history of the case.' " (*In re N.F.* (2021) 68 Cal.App.5th 112, 120.) "Not every change in circumstance can justify modification of a prior order. [Citation.] The change

10

in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate." (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.) "Although the specific factors a court must consider vary with each case, each child's best interests would necessarily involve eliminating the specific factors that required placement outside the parent's home." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 463–464.) "[A] primary consideration in determining the child's best interest is the goal of assuring stability and continuity. [Citation.] When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role." (*Id.* at p. 464.)

Mother challenges the denial of her section 388 petition at the November 2024 hearing on the ground that the juvenile court erroneously found there was no change in circumstances and then failed to reach the second prong of the analysis—i.e., whether granting the section 388 petition was in the minors' best interest. We are unpersuaded. Reasonably understood, the juvenile court's ruling that "circumstances have not changed *to the point that would justify different orders*" was a finding that the requested order would not be in the child's best interests because the circumstances had not sufficiently changed.

Even assuming the juvenile court failed to explicitly address the best interest prong, we may infer an implicit finding that is supported by substantial evidence. (*In re S.G.* (2003) 112 Cal.App.4th 1254, 1260; *In re Jesse B.* (1992) 8 Cal.App.4th 845, 851.)

Specifically, substantial evidence supports a conclusion that Mother's requested modification was not in the minors' best interests. Both minors lived with Grandmother, who had served as their legal guardian and parental figure for nearly their whole lives. Neither minor had any memory

11

of living with anyone else.  And despite generally having weekly visitation with Mother from the time they left her care in April 2017 (with the exception of the break in visitation that occurred between August 2022 and June 2023), and then monthly visitation as of July 2023, expert and witness testimony showed that both minors had a weak attachment to Mother. Jeremiah wanted no more than monthly visits with Mother, while Josiah refused to engage in most visits.  Both minors had anxiety and dysregulation due to court involvement and the prospect of being removed from Grandmother.  At the same time, the evidence established the minors had a substantial, positive, and emotional attachment to Grandmother and wanted her to adopt them.

In sum, Mother has not shown the juvenile court erred in denying her section 388 petition.

### B.  Parental-Benefit Exception

Once the juvenile court terminates reunification services and determines a dependent child is adoptable,[4] it must select adoption as the permanent plan and terminate parental rights unless it finds that doing so would be detrimental to the child under one of several statutory exceptions. (§ 366.26, subd. (c)(1); *In re Caden C.* (2021) 11 Cal.5th 614, 630–631 (*Caden C.*).)  " '[T]he statutory exceptions merely permit the court, *in exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption.' "  (*Caden C.*, at p. 631, italics added.)

As relevant here, the "parental-benefit exception" may apply when a parent has " 'maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' "  (§ 366.26,

---

4        There was no dispute below, and none raised on appeal, that the minors are adoptable and likely to be adopted.

subd. (c)(1)(B)(i); *Caden C.*, *supra*, 11 Cal.5th at p. 625, fn. 2 & p. 631.) In order to qualify for the exception, a parent must prove, by a preponderance of the evidence: (1) that the parent has engaged in "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, at p. 636.) Failure to establish any of these three elements is dispositive.

There is no question Mother satisfied the first element of the parental-benefit exception. That said, the Department argues Mother did not satisfy the second element of the exception as to Jeremiah,[5] i.e., she failed to prove that Jeremiah had a "substantial, positive, emotional attachment" to her. Mother does not respond to this argument.[6]

---

[5]     With regard to the termination of parental rights, both parties focus their arguments on whether there was an abuse of discretion in terminating parental rights as to Jeremiah. As such, we focus our analysis on Jeremiah as well. As recounted above, however, the evidence compellingly established that Josiah had no substantial, positive, emotional attachment to Mother.

[6]     Mother seems to suggest the juvenile court made explicit findings as to the elements of the parental-benefit exception when it terminated parental rights, such that only the third element of the exception is at issue. The record does not bear this out. To the contrary, the record reflects the Department and Mother contested whether the minors had a substantial, positive, emotional attachment to Mother. The court indicated it agreed that Josiah had no substantial, positive, emotional attachment to Mother, but also indicated that Jeremiah's case was more difficult and asked the parties to address whether allowing Josiah to be adopted while keeping Jeremiah in a guardianship would be destabilizing, and whether the court could consider that "externalit[y]." Mother argued it should not be considered in determining whether the parental-benefit exception applied. The

Again, to meet the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) "A 'significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.' [Citation.] A positive attachment between parent and child is necessarily one that is not detrimental to the child but is nurturing and provides the child with a sense of security and stability. Finally, an emotional attachment is one where the child views the parent as more than a mere friend or playmate and who's interactions with the parent were not ambivalent, detached, or indifferent." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.)

As the Supreme Court explains, "the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the

---

Department argued whether adoption would bring Jeremiah stability was something the court could properly consider.

Ultimately, the court ruled it was terminating Mother's parental rights, but made no explicit findings as to any of the elements of the exception. Mother does not contend this was error, and the court's ruling appears appropriate. (See *In re A.L.* (2022) 73 Cal.App.5th 1131, 1156 ["we are aware of no requirement . . . that the juvenile court, in finding the parental-benefit exception inapplicable, must recite specific findings relative to its conclusions regarding any or all of the three elements of the exception"]; see, e.g., *In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1109.) After making its ruling, the court specifically stated: "During the morning, the Court has had many discussions, some more relevant than others. *I'm looking at what the external effects of the order would be and how to minimize that*. So I have mentioned my concerns as to different aspects of the relationship. *That does not mean I was basing my decision on any comment that was actually not legally relevant but I thought should be explored by the parties*." (Italics added.)

"positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  "[O]ften expert psychologists who have observed the child and parent and can synthesize others' observations will be an important source of information about the psychological importance of the relationship for the child." (*Id.* at pp. 632–633.)  We review the court's findings as to this second element of the parental-benefit exception for substantial evidence.  (*Id.* at pp. 639–640.)

Here, substantial evidence supports the juvenile court's implicit determination that Jeremiah had no "substantial, positive, emotional attachment" to Mother.  Jeremiah lived with Mother for a relatively short period of his life, having been detained and placed with Grandmother when he was just 16 months old.  By the time of the contested section 366.26 hearing, Jeremiah was eight years old and had lived nearly his whole life with Grandmother as his guardian and parental figure.  Neither of the minors had any memory of living with Mother, and both consistently reported a desire to live with Grandmother, with whom they have a "substantial, positive, emotional attachment."  When asked, both minors "clearly expressed their desire to be adopted" by Grandmother.

Jeremiah was more amenable than Josiah to visits with Mother, and Jeremiah's therapist indicated Jeremiah "deeply" loved her.  Jeremiah appeared afraid and anxious after Mother told him she was moving to Los Angeles.  But Dr. Anderson, the expert who authored the bonding study, testified that Jeremiah's bond with Mother was similar to that with any other familiar adult.  The bonding study documented an interview with Jeremiah, where he said nothing unprompted about Mother when asked to talk about family members other than Grandmother.  And Jeremiah stated expressly he did not want more than monthly visits.  The minors did not initiate

engagement during visits and did not hug or say goodbye to Mother without prompting. Typically, visits would end with the minors running to Grandmother. Jeremiah once said he was scared of Mother.

As to the effect of interactions between Jeremiah and Mother, the minors' therapist indicated Jeremiah was worried he would be taken away from Grandmother. Jeremiah exhibited no distress upon departing visits with Mother. Indeed, at the end of the bonding study visit, which appeared to be pleasant, Jeremiah did not exhibit any significant distress; instead, he did a "fist pump" and appeared excited after Mother left the room. Further, Jeremiah showed signs of stress after visits, e.g., he sucked his thumb, asked Grandmother to hold him like a baby, and soiled himself in his sleep.

Campbell-Brown testified Jeremiah has anxiety around his relationship with Mother and has a "difficult relationship" with her. Campbell-Brown and Dr. Anderson agreed that minors did not have a substantial, positive, emotional attachment to Mother. The bonding study indicated Jeremiah had a moderately positive though "relatively weak" attachment to Mother.

Mother has not clearly addressed, much less demonstrated, that she proved the second element of the parental-benefit exception. (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 816 (*Andrew M.*) ["To satisfy this element, parents 'must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits' [citations], they must establish a substantial, positive, emotional attachment between them and the child"].) On this record, which consists of substantial evidence that the minors had no significant, positive, emotional attachment to Mother, we cannot conclude the juvenile court erred in concluding the parental-benefit exception did not apply.

While this alone is sufficient to affirm the juvenile court's ruling (see, e.g., *In re Katherine J.* (2022) 75 Cal.App.5th 303, 322, fn. 10), we briefly note the third prong of the parental-benefit exception requires courts to determine whether "the benefit of placement in a new, adoptive home outweigh[s] 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' " (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Mother fails to argue the court's decision under this prong was arbitrary, capricious, or patently absurd. (*Id.* at pp. 640–641.) Instead, she focuses largely on arguing the juvenile court abused its discretion by considering whether Jeremiah's permanent plan should match Josiah's, which she alleges was an impermissible consideration and erroneous "de facto fourth prong to the *Caden C.* analysis." We are not persuaded.

The "parental-benefit exception deals with the child's relationship with the parents, and it is not appropriate to consider relationships with other family members in assessing this exception." (*Andrew M.*, *supra*, 102 Cal.App.5th at pp. 817–818; see *Caden C.*, *supra*, 11 Cal.5th at p. 633 [with regard to the third element, courts must determine "what life would be like for the child in an adoptive home *without the parent* in the child's life," italics added].) The record, however, does not establish the claimed error. As discussed in footnote 6, *ante*, the court disclaimed any reliance on matters that were legally irrelevant, clearly alluding to its questions about whether allowing Josiah to be adopted while keeping Jeremiah in a guardianship would be destabilizing.

In any event, considering the entirety of the record, including the evidence of the weakness of the bond between the minors and Mother, we cannot say the court abused its discretion in concluding the benefits of permanence outweighs the maintenance of Jeremiah's relationship with

Mother.  (See, e.g., *Andrew M.*, *supra*, 102 Cal.App.5th at p. 818; *In re I.E.* (2023) 91 Cal.App.5th 683, 692–694.)

## DISPOSITION

The order denying Mother's section 388 petition and terminating her parental rights is affirmed.

_____
Fujisaki, Acting P.J.

WE CONCUR:


_____
Petrou, J.


_____
Rodríguez, J.


*Sonoma Co. HSD v. W.C.* (A172064)